1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

7

## SOUTHERN DISTRICT OF CALIFORNIA

8
9

10  T.B., a minor, by and through his *Guardian ad Litem*, ALLISON BRENNEISE, and
11  ROBERT BRENNEISE,

12                                                      Plaintiffs,

13                        vs.

14

15

16  SAN DIEGO UNIFIED SCHOOL DISTRICT,

17                                                      Defendant.

18  ─────────────────────────────

19  SAN DIEGO UNIFIED SCHOOL DISTRICT,
20                                                      Plaintiff,
            vs.
21

22  BRENNEISE, et al.,

                                                        Defendants.
23

CASE NO. 08CV28-MMA (WMc)

[Consolidated Action]

**ORDER DENYING SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT AS TO FIRST CAUSE OF ACTION; AND**

[Doc. Nos. 85]

**DENYING SCHOOL DISTRICT'S MOTION TO SUPPLEMENT RECORD**

[Doc. No. 106]

24       Currently before the Court is the San Diego Unified School District's ("School District")

25  Motion for Partial Summary Judgment on its First Claim for Relief under the Individuals with

26  Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq*.; or in the alternative, Motion for a

27  Ruling on its Appeal under the IDEA.  The Brenneises (son, mother, and father) oppose the motion.

28  The Court heard oral argument on December 2, 2009.  For the following reasons, the Court

1    **DENIES** the School District's motion.  The Court also **DENIES** the School District's

2    accompanying motion to supplement the record.

3    **I.**     **FACTUAL BACKGROUND**

4          This case concerns the 2006-2007 school year, when T.B. turned thirteen.  At the time, T.B.

5    had been home-schooled with publicly-funded assistance, including an occupational therapist, but all

6    concerned wanted T.B. in a school environment with peers.  *E.g.*, FF ¶ 129.[1]  A transition plan was

7    created, which described four phases to ease T.B. from home to school by starting with two hours at

8    school and increasing the time until he would attend all six periods at school.  FF ¶ 195; *see also*

9    Sch. Dist.'s Separate Statement of Material Fact ("SSMF") ¶ 52.

10         In addition to autism, T.B. has Phenylketonuria ("PKU") which caused brain damage and

11   physical difficulties.  FF ¶¶ 3-6.  T.B. is unable to metabolize a common amino acid (phenylalanine

12   or PHE) found in protein.  His low-protein diet must be closely monitored and supplemented with a

13   special formula two or more times a day.  T.B. ingests the formula through a gastrostomy tube ("G-

14   Tube"), which is "a surgically implanted vessel that leads from a plug on the surface of his skin

15   through a tube into his stomach."  *Id.* ¶ 216.  The formula must be measured and mixed; poured into

16   a syringe, which is then inserted into the G-tube; and finally, flushed clean with water.  *E.g., id.* ¶

17   216.  The feeding process takes about 20 minutes, but T.B. may need to rest briefly if nausea occurs.

18   *See* SSMF ¶ 57 (uncontested).  T.B.'s motor skills, coordination, and attention span are impaired,

19   and an adult supervises him when he measures and mixes the formula.  *E.g.,* SSMF ¶¶ 7-8 (2003

20   IEP); *see also* ¶¶ 42, 87.

21   **II.**     **STATUTORY FRAMEWORK AND PROCEDURAL HISTORY**

22         The IDEA "confers upon disabled students an enforceable substantive right to public

23   education in participating States, and conditions federal financial assistance upon a State's

24   compliance with the substantive and procedural goals of the Act."  *Honig v. Doe*, 484 U.S. 305, 310

25   (1988) (citation and footnote omitted) (when first enacted in 1975, the statute was called the

26   Education of the Handicapped Act).  "The IDEA's primary purpose is 'to assure that all children

27   ───────────────────

28         [1] The parties lodged the Administrative Record ("AR") under seal.  The Court uses the parties'
     citation method, including "FF" for the factual findings and "LC" for the legal conclusions in the
     administrative decision.

1    with disabilities have available to them . . . a free appropriate public education which emphasizes

2    special education and related services designed to meet their unique needs.'" *Ojai Unified Sch. Dist.*

3    *v. Jackson*, 4 F.3d 1467, 1469 (9th Cir. 1993) (quoting 20 U.S.C. § 1400(c)). A free appropriate

4    public education ("FAPE") provides a "basic floor of opportunity" through an individually designed

5    program to offer an "educational benefit" to the child. *Board of Educ. of Hendrick Hudson Central*

6    *Sch. Dist. v. Rowley*, 458 U.S. 176, 201 (1982).[2]

7         To achieve the IDEA's purpose, a team of the child's parents, teachers, and representatives

8    from the school district meet every year to develop an "individualized education program" ("IEP") –

9    a written plan tailored to address the educational needs and goals of the student. *Ojai*, 4 F.3d at

10    1469. In addition to setting forth specific educational goals and other required elements, the IEP

11    must contain "a statement of the special education and related services" to be provided to the child.

12    *Id.*; 20 U.S.C. § 1414(d) (defining IEP). This case involves two proposed IEPs (one dated August

13    30, 2006 and a second dated December 4, 2006), but neither plan was implemented.

14         In addition, California law supplements the procedural and substantive requirements of the

15    IDEA. Cal. Ed. Code § 56000 *et seq*. State standards that impose higher standards than the IDEA

16    are enforceable when they are not inconsistent with the federal statute. *W.G. v. Board of Trustees of*

17    *Target Ranch Sch. Dist.*, 960 F.2d 1479, 1483 (9th Cir. 1992), *superseded by statute on other*

18    *grounds by* Individuals with Disability Education Act Amendments of 1997, Pub. L. 105-17, §

19    614(d)(1)(B), 111 Stat. 37.

20         A party who is dissatisfied with an IEP can secure a "due process" hearing with the State

21    educational agency; thereafter, an "aggrieved" party may seek federal judicial review of the

22    administrative findings and decision. 20 U.S.C. §§ 1415(f), (g), (i)(2). In this case, both the School

23    District and the Brenneises sought administrative review of T.B.'s IEPs. An Administrative Law

24

---

25         [2] FAPE is defined as special education and related services that (1) are provided without charge, at public expense, and under public supervision and direction, (2) meet the standards of the State

26    educational agency, (3) include an appropriate preschool, elementary school, or secondary school education, and (4) are provided in accordance with an individualized education program. 20 U.S.C. §

27    1401(9).

28         The statute has been amended frequently, thus, the citations in published cases do not always match the organization in the current statute.

Judge "ALJ" from the California Office of Administrative Hearings ("OAH") concluded T.B. was entitled to relief on three issues, but the School District prevailed on the remaining fifteen issues. Compl. Ex. A.  Both parties seek judicial review of the OAH Decision, but the School District's summary judgment motion concerns only issues relative to T.B.'s G-Tube feedings and the transition plan.  On those issues, the ALJ ruled in the Brenneises' favor and modified the IEPs. Compl. Exs. A & B (Order Denying Mot. for Clarification).

Both procedural and substantive violations of the IDEA may occur.  A school district, in creating and implementing an IEP, can run afoul of the Act's procedural requirements.  "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process, . . . as it did upon the measurement of the resulting IEP against a substantive standard." *Rowley*, 458 U.S. at 205-06; *W.G.*, 960 F.2d at 1485.  For example, the IDEA requires parental notification of any proposed change in the child's "educational placement." *Ojai*, 4 F.3d at 1469; 20 U.S.C. § 1415(b)(3).  A procedural violation, such as a technical flaw, may be harmless error. *R.B. v. Napa Valley Unified Sch. Dist*, 496 F.3d 932, 938 & n.4 (9th Cir. 2007); *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 892 (9th Cir. 2001).  Once the Court finds a procedural flaw, it determines if the error affected the substantive rights of a parent or child. *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 901 (9th Cir. 2009).  A child is denied a FAPE when the procedural violation results in the "loss of an educational opportunity" or when the parents' opportunity to participate has been "seriously infringed." *R.B.*, 496 F.3d at 938-41; *W.G.*, 960 F.2d at 1484-85.  Alternatively, a school district can violate a substantive right of the IDEA when the IEP is not reasonably calculated to enable the particular child to receive educational benefits. *Rowley*, 458 U.S. at 202-04; *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999) (substantive review asks whether the IEP was reasonably calculated to confer a meaningful benefit).

### III.   STANDARD OF REVIEW

This Court reviews the ALJ's administrative decision by considering the record from the administrative proceedings, hearing additional evidence at the request of a party, and basing its decision on the preponderance of the evidence.  20 U.S.C. § 1415(i)(2).  As the party challenging the

1    ALJ's decision, the School District bears the burden of demonstrating the ALJ's decision should be

2    reversed. *L.M.*, 556 F.3d at 910.

3          In IDEA cases, federal courts give "due weight" to the state administrative proceedings.

4    *Rowley*, 458 U.S. at 206.  Courts give "particular deference" to "thorough and careful" findings,

5    recognizing that the "fact-intensive nature of a special education eligibility determination coupled

6    with considerations of judicial economy render a more deferential approach appropriate." *R.B.*, 496

7    F.3d at 937 & n.1 (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994) and *Hood*

8    *v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1104 n.4 (9th Cir. 2007)).

9          Here, the record demonstrates the ALJ rendered findings based on a careful and thorough

10   consideration of the evidence and applicable law. *L.M.*, 556 F.3d at 908; *Union*, 15 F.3d at 1524.

11   During the 27-day hearing, the parties submitted over 500 exhibits and the ALJ heard testimony

12   from numerous educators and medical professionals.  The ALJ actively participated in the process,

13   and issued a 75-page decision with a complete background and "discrete analysis supporting the

14   ultimate conclusions." *R.B.*, 496 F.3d at 942.  Accordingly, the Court gives her findings particular

15   deference.

16   **IV.   DISCUSSION**

17         **A.      Motion to Supplement Administrative Record**

18         After the ALJ issued her decision, the Brenneises moved to Minnesota and enrolled T.B. in a

19   Minnetonka public school.  The School District moves to supplement the administrative record with

20   information about how the new school handled T.B.'s G-Tube feedings in 2008 and 2009.  The

21   School District obtained T.B.'s current school records by conducting discovery on the Brenneises'

22   separate claims for relief pursuant to the Americans with Disabilities Act and the Rehabilitation Act.

23   The documents include correspondence about T.B.'s IEP and health care plans offered by the

24   Minnetonka public school.  The School District argues the records show T.B. has been able to attend

25   a public school safely without a health plan in place that identifies who would administer his G-

26   Tube feedings.

27         The IDEA allows district courts to hear "additional evidence," which courts have interpreted

28   to include "evidence concerning events occurring subsequent to the administrative hearing."  20

1    U.S.C. § 1415(i)(2)(B); *Ojai*, 4 F.3d at 1472-73 (citation and quotation omitted).  The district court

2    exercises discretion when accepting additional evidence, and must avoid changing the nature of

3    review into a trial *de novo* that would "undercut the statutory role of administrative expertise." *Ojai*,

4    4 F.3d at 1473 (citation and quotation omitted).  In addition, the district court does not judge the

5    effectiveness of the school's plan in hindsight, because "an IEP must take into account what was,

6    and was not, objectively reasonable when the snapshot was taken, that is, at the time the IEP was

7    drafted." *Adams*, 195 F.3d at 1149 (citation and quotation omitted).

8          Accordingly, the Court declines to accept the School District's proposed evidence.  The

9    pending summary judgment motion concerns the School District's IDEA cause of action for judicial

10   review of an administrative decision, not the Brenneises' other legal claims on which discovery was

11   conducted.  The arguments advanced by the School District regarding the supplemental evidence

12   invite the Court to evaluate the correctness of the ALJ's decision in hindsight, with evidence of

13   T.B.'s actual performance two years later in another State with its own regulations.  The existing

14   administrative record, which is vast and comprehensive, contains sufficient evidence for the Court to

15   review the ALJ's decision regarding T.B.'s needs for his 2006-2007 school year; T.B.'s subsequent

16   performance in a different school is largely inapposite.  If the Court were to accept the proffered

17   evidence, it would entangle the Court in issues about the effectiveness of the Minnesota school's

18   IEP.

19         Indeed, the School District requests permission to allow further supplementation as the

20   discovery process proceeds.  In response, the Brenneises assert their right to call witnesses to

21   explain notes in the records showing T.B.'s visits to the nurse's office for assistance with his G-

22   Tube feedings.  For example, the Brenneises argue the records show the school nurse trained

23   medical para-professionals to administer T.B's feedings in the few instances when she was not

24   available herself.  Taking these circumstances together, the Court declines to consider evidence of

25   how a different school district subsequently handled T.B.'s special needs.

26         As discussed below, the ALJ appropriately reached her decision based upon the required

27   content of an IEP under federal and state law, and the particular provisions of California law that

28   address the qualifications of personnel who may assist students with G-Tubes.  The existing record

1  already contains evidence T.B. was able to assist by mixing the formula and injecting the syringe.

2  *See, e.g.,* SSMF ¶¶ 8, 57; FF ¶ 216.  T.B.'s current ability to assist his new school nurse does not

3  change the analysis of the legal issue of the qualification of the individual who would be supervising

4  T.B.'s feeding procedure.

5        **B.**    **G-Tube Feeding**

6        The ALJ concluded T.B. was denied a FAPE for the 2006-2007 school year because the

7  School District failed to develop a health care plan that would enable him to attend school safely.

8  Specifically, the ALJ held the failure to include the feeding procedure and specify the category of

9  employee who would assist T.B. deprived his parents of the opportunity to use the IEP process to

10  consent to the manner of delivery of service.  The ALJ also found T.B.'s G-Tube feedings are a

11  specialized physical health care service.  LC ¶ 42 (citing FF ¶¶ 216-19).  This is consistent with the

12  School District's own policies, which are published on its website and recognize the treatment.  *Id.*

13        The ALJ relied on the federal requirement that an IEP specify the "related services," such as

14  nursing services, which "may be required to assist a child with a disability to benefit from special

15  education."  *Id.* ¶ 40.  The ALJ also relied on California law that "[h]ealth and nursing services may

16  include specialized physical health care services if necessary to meet a child's unique educational

17  needs."  *Id.* ¶ 41.  "Specialized" health care services mean those prescribed by the child's doctor that

18  must be performed by an individual with medical training when "necessary during the school day to

19  enable the child to attend school."  *Id.*  California regulations provide that "specific continuing

20  specialized physical health care services required in order for the individual to benefit from special

21  education *will be included* in the IEP."  *Id.*

22        Yet T.B.'s IEP did not offer him nursing services; instead, it merely identified the behavioral

23  aide as a potential source for assistance.  The ALJ found this violated California law, which only

24  permits two types of employees to provide specialized physical health care services: (1) qualified

25  persons who possess an appropriate credential; and (2) qualified designated school personnel trained

26  in the administration of specialized physical health care if they perform those services under the

27  supervision of a credentialed school nurse or licensed physician.  FF ¶ 235.  Because T.B.'s IEP did

28  not specify which classification of employee would be performing his G-Tube feeding, his parents

had no way to be sure that a qualified person would be assisting their child.   The ALJ reasonably rejected the School District's proposal to use T.B.'s individual health support plan ("IHSP") as a substitute for the IEP.  *Id.* ¶ 220-22.  Because the IHSP would be prepared *after* the IEP was accepted by the student's parents, it could not fulfill the legal requirement that the G-Tube feedings be included in the IEP.

As a remedy, the ALJ added the following language to T.B.'s December 4, 2006 IEP:

> G-Tube feedings will be scheduled daily in the nurse's office.  A school nurse will be present and will personally assist the student with the student's G-Tube feeding.  The G-Tube feeding will occur at the time(s) and in the manner designated in a doctor's order from Student's current physician.  Student's mother will be responsible for providing the school nurse with a current doctor's order specifying the time(s) of the G-Tube feeding and the amount of formula to be used in the feeding(s), and for providing updated doctor's orders whenever there is any change in the G-Tube feedings.

OAH Decision at 74, ¶ 1.

The School District alleges the ALJ "wrongfully ordered the District to modify the IEP to require a school nurse to be present to personally assist T.B. with his g-tube feedings and wrongfully concluded that T.B. would not have been safe at school under the December 4, 2006 IEP."  Compl. ¶ 20.  According to the School District, the ALJ's decision exceeded the statutory requirement by concluding the IEP must detail who would administer the G-Tube feedings.  *Dept. of Educ. v. Katherine D.*, 727 F.2d 809, 814-15 (9th Cir. 1984).  The District contends the service did not need to be delineated in the IEP because it would be in a separate health management plan, such as those used for any child receiving medicine at school.  In addition, the ALJ's legal conclusion is "untenable" because the IEPs "substantively identified" that a nurse would train other staff members to assist T.B. with his G-Tube feeding.  Def.'s Br. at 9.

In addition, the School District maintains that the behavioral aide could have been trained and supervised by a school nurse to assist T.B. with his G-Tube feedings.  SSMF ¶¶ 69 & 77.  The District points to evidence that T.B. was able to mix and pour the formula into his feeding tube in 2003, thus, he was able to perform the same task in 2006-2007.  Def.'s Br. at 13, fn.8 & 9.  Accordingly, any adult with appropriate training by a school nurse, could perform the feeding procedure.  For example, T.B.'s mother had been serving that function when T.B. was at home.

/ / /

- 8 -

1    The School District further complains that the ALJ's conclusion allows parents to dictate the

2    identity of the assigned staff person. *Slama v. Independent Sch. Dist. No. 2580*, 259 F. Supp. 2d

3    880, 884-85 (D. Minn. 2003). It characterizes the problem as one of procedure, that is a lack of

4    clarity, that does not deny T.B. a FAPE. *Van Duyn v. Baker Sch. Dist. 5J*, 502 F.3d 811, 821 (9th

5    Cir. 2007). Here, T.B.'s mother was "astute, dedicated and well-versed in special education

6    procedures," who acted as an advocate for other parents, and actively participated in the formation

7    of her son's special education plan. FF ¶ 18. Therefore, the District contends his mother could have

8    eliminated any confusion simply by discussing the matter with the staff.

9    The law does not support the School District's arguments.[3] Both federal and state law

10   require the written IEP to state the health care services that will be provided to the student. 20

11   U.S.C. § 1414(d)(1)(A)(i)(IV) (IEP statement of "related services"); 34 C.F.R. § 300.320(a)(4); Cal.

12   Educ. Code § 56363(a) & (b)(12) ("services" includes "school nurse services") & § 56345(a)(4)

13   (IEP statement of services). Both federal and state law require personnel to be "appropriately

14   trained and supervised" or "qualified." 20 U.S.C. § 1412(a)(14)(B)(iii); 34 C.F.R. § 300.34(a) &

15   (c)(13); Cal. Educ. Code § 49423.5; Cal. Code Regs. tit. 5, § 3051.12 (2010). California law

16   specifically lists "gastric tube feeding" as an example. Cal. Educ. Code § 49423.5(d). The Court

17   concludes the ALJ correctly applied the governing law.

18   The School District has not shown errors of fact. *See* Brenneise's Opp. Br. at 12-14 & 18.

19   The ALJ noted T.B. "is capable of mixing his own formula." FF ¶ 216; *see* SSMF ¶ 57. But she

20   also correctly noted that T.B. required adult supervision. FF ¶ 216; *see* FF ¶ 138; *cf.* SSMF ¶ 8 (in

21   2003, an adult prompts T.B. when he gets distracted). T.B.'s parents are not asking for a particular

22   person to assist their son with the G-Tube procedure; they are asking that a *qualified* person perform

23   that health care function. *Slama*, 259 F. Supp. 2d at 884-85. The ALJ correctly found T.B.'s

24   behavioral aide was not responsible for the G-Tube feedings. FF ¶¶ 228 & 240; LC ¶ 47. The ALJ

25   cited conflicting testimony by staff members as to who would be responsible, which supports her

26   

27   _____

     [3] The School District's briefs contain numerous lesser points. One example is the argument that
28   T.B.'s mother "forfeited" any right to criticize the offered services because of her "obstruction and lack
     of cooperation." To the extent that this Order does not expressly address all of the arguments raised in
     the briefs, the Court concludes they lack merit.

1   conclusion that the procedure should be memorialized in the IEP.  *E.g., id.* ¶¶ 217, 227, & 231;

2   *Union*, 15 F.3d at 1526.  Additionally, the IEP provided only 30 minutes of on-going nursing time,

3   while each feeding procedure took approximately 20 minutes.

4        The School District cites *Katherine D.*,727 F.2d at 814-15, as being "directly on point" for

5   the proposition that an IEP need not specify the staff person who would be trained to provide health

6   needs.  In that case, the student's personal physician trained teachers to maintain a tracheostomy

7   tube.  The physician testified that he overheard two teachers expressing reluctance to perform the

8   service.  Later, several teachers' unions filed grievances seeking clarification whether their contracts

9   required them to perform medical services for disabled students.  The district court, in the first

10   instance, decided the issue and relied on those facts to find the IEP was "unworkable and

11   ineffectual." *Id.* at 814 & n.3.  The Ninth Circuit held the factual finding was clearly erroneous

12   because it was conjectural to assume the teachers would have refused to aid the student if ordered to

13   do so pending resolution of the unions' grievance proceeding.  *Id.* at 814 & n.5.  There was no

14   evidence the teachers were "not competent" to provide the care.  By contrast, here, the ALJ found

15   the IEP did not specify that a qualified person would perform the health service.

16        The Court also does not find the issue to be a technical procedural violation.  As the

17   Brenneises correctly point out in their opposition brief, T.B. required G-Tube feedings during the

18   school day in order to maintain proper metabolic control of his medical condition and thereby

19   receive adequate nutrition to sustain him so he could benefit from his classes.  Opp. Br. at 5.  "[I]f

20   student does not get sufficient PHE each day, his body could begin to break down the tissue in his

21   system, causing him harm."  FF ¶ 207.

22        **C.**     **Four Phases of the Transition Plan from Home to School**

23        The second issue in the School District's motion concerns the ALJ's conclusion that the

24   transition plan from the home-based program to a school-based program in the December 4, 2006

25   Proposed IEP denied T.B. a FAPE.  FF ¶¶ 190-203.  The ALJ held "the parents were not included in

26   the collaboration teams that would decide when to move Student from one phase of the project to the

27   next." LC ¶ 54.  The transition plan did not specify the mechanism for T.B.'s parents to receive

28   notice that he would be moved to the next phase and did not specify a procedure if the parents'

1   disagreed with the staff's conclusion T.B. should move on.  FF ¶¶ 194 & 201.  The ALJ also found

2   the transition plan "incomplete and confusing" because it did not state who would determine when

3   T.B. should move up, the extent to which T.B. would continue to receive disabled services at home,

4   and its open-ended nature allowed any phase to become his placement for the entire 2006-2007

5   school year.  FF ¶¶ 199-200; LC ¶¶ 51-52.  To remedy the violation, the ALJ modified the IEP to

6   specify that T.B.'s mother was a member of the collaboration team tasked to decide when T.B. was

7   ready to move on to the next step.  OAH Decision at 74, ¶¶ 2-3.  Although the Brenneises made

8   other objections, the ALJ concluded the mother's participation in the decision-making process

9   would allow her to express those concerns as T.B. progressed through the four phases.  FF ¶ 202.

10          The School District argues the ALJ exceeded her authority because the IDEA does not

11   require a written transition plan.  Moreover, the plan identified four phases to effectuate a gradual,

12   smooth transition, but those transitions did not constitute a "change of placement" that would require

13   parental consent.  The entire transition process would take a few weeks.  Compl. ¶ 22; SSMF ¶ 49.

14   The Court finds no error in the ALJ's decision.  Parental participation is a cornerstone of the IDEA

15   and its governing regulations.  *Rowley*, 458 U.S. at 205-06.  For example, school districts "shall

16   ensure that the parents of each child with a disability are members of any group that makes decisions

17   on the educational placement of their child."  20 U.S.C. § 1414(e); *id.* § 1415(a)-(c) (procedural

18   safeguards include notice on matters relating to "the identification, evaluation, or educational

19   placement of the child"); 34 C.F.R. § 300.327 &  § 300.501.  The term "educational placement" is

20   not subject to a bright line definition but instead refers to the whole range of education and related

21   services.  *See DeLeon v. Susquehanna Cmty. Sch. Dist.*, 747 F.2d 149, 153-54 (3d Cir. 1984)

22   (touchstone of "educational placement" "is whether the decision is likely to affect in some

23   significant way the child's learning experience"); *Spilsbury v. Dist. of Columbia*, 307 F. Supp. 2d

24   22, 26-27 (D.D.C. 2004).  Procedural inadequacies that "seriously infringe the parents' opportunity

25   to participate" result in the denial of FAPE.  *W.G.*, 960 F.2d at 1485.

26          Here, T.B.'s IEP included a transition plan that required additional decision making in order

27   to be implemented.  The unusual transition plan was significant to T.B. since his services would

28   change at each phase and it concerned the critical issue of integrating T.B. into a school-based

1   program.  *E.g.*, FF ¶ 201; LC ¶ 51; *cf.* Calif. Educ. Code § 56345(b)(4) (requiring, in certain

2   circumstances, IEP to include transition plan into regular class).  The ALJ correctly applied federal

3   and state law to require T.B.'s IEP to include parental involvement in the implementation of the four

4   phases of the transition from an exclusively home-based program into a full day of public school.

5           **D.       Private Provider**

6           The third issue also relates to the transition plan.  The ALJ modified T.B.'s transition plan to

7   provide that until he reached phase four of the plan (*i.e.*, attending school through sixth period), his

8   District-funded services would continue with his current providers.  The School District argues the

9   ALJ violated California law by requiring the District to provide services during the entire transition

10  period from an occupational therapy agency (School Options) that was not certified by the

11  California Department of Education.  FF ¶ 199; Cal. Ed. Code § 56505.2 ("A hearing officer may

12  not render a decision . . . that results in a service for an individual with exceptional needs provided

13  by a nonpublic, nonsectarian agency, if the school or agency has not been certified pursuant to

14  Section 56366.1).

15          Although the Court's tentative ruling was to grant this part of the motion, the Court has

16  conducted further research and declines to adopt its tentative.  Based upon controlling case law, the

17  School District's argument fails.  The Supreme Court has held, reimbursement is not barred even

18  when the private institution does not satisfy the State's education standards.  *Florence County Sch.*

19  *Dist. Four v. Carter*, 510 U.S. 7, 14 (1993).  In *Carter*, parents rejected the IEP placement in public

20  school and unilaterally enrolled their child in a private school.  Two of the faculty members of the

21  private school were not state-certified and the school district argued it did not have to reimburse the

22  parents for the non-certified placement.  The Supreme Court disagreed, holding the IDEA did not

23  necessarily bar reimbursement in such circumstances.  "'[I]t hardly seems inconsistent with the

24  Act's goals to forbid parents from educating their child at a school that provides an appropriate

25  education simply because that school lacks the stamp of approval of the same public school system

26  that failed to meet the child's needs in the first place.'"  *Id.* at 14 (quoting Court of Appeal's

27  decision).  The Court's conclusion was also based upon the IDEA's equitable authority to guarantee

28  a FAPE to disabled children by fashioning appropriate relief.  *Id.* at 12 (citing *School Comm. of*

1  *Burlington v. Department of Educ. of Mass.*, 471 U.S. 359, 369-70 (1985)); *id.* at 15-16.[4]  The Ninth

2  Circuit has applied this rule over a school district's objection to a placement that was not certified by

3  the State of California to provide special education.  *Union*, 15 F.3d at 1526.

4  　　　　The School District argues these cases do not apply to related services like the occupational

5  therapist.  The Court is not persuaded by the proposed distinction.  "The Act was intended to give

6  handicapped children both an appropriate education and a free one; it should not be interpreted to

7  defeat one or the other of those objectives."  *Burlington*, 471 U.S. at 372.  Here, T.B. was denied an

8  appropriate education due to issues concerning his G-Tube feeding and transition plan;

9  consequently, the ALJ achieved an equitable result by requiring the School District to pay for an

10  occupational therapist until T.B. reached phase four, *i.e.*, a full day at public school, so that T.B.'s

11  education in 2006-2007 was free.

12  　　　　The ALJ's decision is also supported by the IDEA's "stay put" provision that requires the

13  student to remain in his current educational placement pending the resolution of the administrative

14  and judicial review process.  20 U.S.C. § 1415(j).  The School District had an obligation to maintain

15  T.B.'s existing services, including his occupational therapist, until the dispute with his parents was

16  completely resolved.

17  **V.**    **CONCLUSION**

18  　　　　Based on the foregoing reasons, the Court **DENIES** the San Diego Unified School District's

19  Motion for Partial Summary Judgment on its First Claim for Relief under the Individuals with

20  Disabilities Education Act, or in the alternative, Motion for a Ruling on its Appeal under the IDEA.

21  The Court also **DENIES** the motion to supplement the administrative record.

24  */ / /*

---

26  　　　　[4] Congress amended the IDEA in 1997 to clarify the circumstances in which parents who
unilaterally place their child in private school may obtain reimbursement for that expense from the
27  public school district.  *Forest Grove Sch. Dist. v. T.A.*, 523 F.3d 1078, 1085-86 (9th Cir. 2008), *aff'd*,
129 S. Ct. 2484 (2009).  On appeal, the Supreme Court re-affirmed the logic of its decisions in
28  *Burlington* and *Carter* to hold that the IDEA did not impose a "categorical" bar to reimbursement
merely because a service provider did meet a State's certification standards.  *Forest Grove*, 129 S. Ct.
at 2491-95.

1    On a housekeeping note, the Clerk shall correct the caption and all docket entries to refer to

2    the minor child by his initials "T.B." instead of his full name.  Gen. Order 514-C.  Counsel shall also

3    follow this privacy rule in future pleadings.

4    **IT IS SO ORDERED**.

5

6    DATED:  June 1, 2010

7

8    Hon. Michael M. Anello
     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28