**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| T.B., a minor, by and through his *Guardian ad Litem*, ALLISON BRENNEISE, and ROBERT BRENNEISE,<br><br>　　　　　　　Plaintiffs,<br><br>　　vs.<br><br>SAN DIEGO UNIFIED SCHOOL DISTRICT,<br><br>　　　　　　　Defendant. | CASE NO. 08CV28-MMA (WMc)<br><br>[Consolidated Action]<br><br><br>**ORDER DENYING MOTION FOR AWARD OF COMPENSATORY EDUCATION AND DENYING MOTION FOR ENTRY OF PARTIAL FINAL JUDGMENT**<br><br>[Doc. No. 119] |
| SAN DIEGO UNIFIED SCHOOL DISTRICT,<br>　　　　　　　Plaintiff,<br>　　vs.<br>BRENNEISE, et al,<br><br>　　　　　　　Defendants. | |

///

This action arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq.*, which permits judicial review of an Administrative Law Judge's ("ALJ") decision in the Office of Administrative Hearings.[1] Currently before the Court are two motions (filed together as Doc. No. 119) by T.B., a minor, and his parents Allison and Robert Brenneise. In the first motion, the Brenneises ask for an award of 440 hours of compensatory education services by a credentialed special education teacher to remedy the San Diego Unified School District's ("School District") violation of the IDEA for the 2006-2007 school year. Their second motion asks for entry of a partial final judgment. Fed. R. Civ. P. 54(b). The School District opposes both motions. The Court found the motions suitable for decision without oral argument. For the following reasons, the Court **DENIES** both motions.

## I.   BACKGROUND

This case has a lengthy, technically complicated, and contentious history. The Court therefore summarizes the facts relevant to the pending motions below.

T.B. has received special education services since he began school in 2000 because he has autism and late-diagnosed Phenylketonouria, a condition that caused brain damage and requires T.B. to receive essential nutrients through a gastrostomy tube ("G-tube feedings"). The School District is required to provide T.B. with a "free and appropriate education" ("FAPE"). *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir. 1993) (quoting 20 U.S.C. § 1400(c)). The "individualized education program" ("IEP") document describes the educational and support services that a student will receive to meet his FAPE special educational needs and goals. *Id.*; 20 U.S.C. § 1414(d).

Since 2003 T.B. was in a home program, which his mother called "garage school." Thereafter, the parties could not agree on an IEP for the following three school years, so Mrs. Brenneise taught her son, to the best of her ability, from 2003 to 2006; Mrs. Brenneise is not a credentialed teacher. The School District provided a broad range of assistance (*e.g.*, by hiring behavioral aides and a variety of other support services). The parties settled their disputes about those three school years in a confidential settlement agreement.

---

[1] The ALJ Decision is attached as an exhibit to the original complaint. [Doc. No. 1.] The Court uses the parties' citation method for the numbered paragraphs in the ALJ Decision, including "FF" for the factual findings and "LC" for the legal conclusions in the administrative decision.

In July 2006, the parties agreed to an extended school year ("ESY") summer placement at Coronado Academy. AR 3351-3392 (hereinafter "ESY IEP July 2006"). This is the last time the parties mutually agreed to an IEP for T.B. One element of the 2006 placement provided that T.B. receive 20 hours per week in a "Non Severe Special Day Class." *Id.* In addition to this academic component, the School District continued to provide a wide-range of support services to T.B. The summer program, however, was scheduled to end in July and school was not in session in August. In addition, the Coronado Academy was not in compliance with California law at the time because T.B's two teachers did not have the necessary credentials.[2] In a separate proceeding, the California Department of Education awarded T.B. 24 hours of compensatory language arts education to remedy his time at summer school without a properly credentialed instructor. *E.g.*, AR 5378-79.

The parties anticipated that T.B. might not succeed in the summer placement and they also recognized that their difficult relationship might prevent them from agreeing on an IEP for the regular school year that would commence in September 2006. Accordingly, they included a contingency agreement in the July 2006 IEP that the "stay put" placement would be the home program.[3] AR 3391 ("if there is no agreement on [T.B.'s] 2006-2007 IEP as to school placement, then [his] Home Program shall continue until such time [Mrs. Brenneise] consents to the implementation of an IEP for the 2006-2007-IEP."); ALJ Decision at 54 (FF ¶ 242).

The contingency was triggered when the Coronado Academy asked T.B. to leave after five days, and, as predicted, the parties were unable to agree on an appropriate placement for the 2006-2007 school year. ALJ Decision at 24 (FF ¶ 104). Thus, T.B. remained at home with his mother for the rest of the summer and the next school year.

The parties expressly agreed to the services that would be provided in the "Home Program" until a new IEP was signed. AR 3391. These included various behavioral aids and special services (such as speech and occupational therapy), but expressly excluded the 20 hours per week of "Special

---

[2] The Court takes judicial notice of this Compliance Report. Fed. R. Evid. 201.

[3] A stay put placement ensures the child's education is governed by a mutually-agreed upon IEP during the pendency of administrative proceedings and judicial review. 20 U.S.C. § 1415(j).

Day Class" services. AR 3387 & 3391. In sum, the parties agreed to a home program that did not expressly provide for a credentialed teacher.[4]

Both parties pursued their administrative remedies on a broad range of issues, and on October 3, 2007, the ALJ issued a lengthy decision. The School District prevailed on most issues but the Brenneises prevailed on three. ALJ Decision at 75. In a June 2010 Order, this Court affirmed the ALJ's conclusions that the School District denied T.B. a FAPE for the 2006-2007 school year (1) by failing to provide a nurse to assist T.B. with his G-tube feedings and (2) by denying the parents the right to participate in the plan to transition T.B. gradually from the home-based program into public school. [Doc. No. 118] Except for a request for attorney's fees and declaratory relief, the June 2010 Order resolved the School District's own IDEA complaint. The Brenneises' claims remain unresolved. In their Second Amended Complaint ("SAC"), they seek judicial review of fifteen of the eighteen issues delineated in the ALJ's Decision and they request attorney's fees. SAC ¶¶ 24, 26 & 28-32. They also allege causes of action that arise out of the same facts, but are based on Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131. SAC ¶¶ 33-62. The Brenneises now move for an award of compensatory education to remedy the IDEA violation that this Court affirmed, and to enter partial final judgment to that extent. The Brenneises intend to pursue their other causes of action, but suggest that they may drop some or all of their IDEA issues if the Court awards T.B. compensatory education services.

## II.    MOTION FOR AN AWARD OF COMPENSATORY EDUCATION[5]

As noted, the Court agreed with the ALJ that T.B. was denied a FAPE for the 2006-2007 school year. The proposed IEP failed to provide a qualified health care worker to assist T.B. with his G-tube feedings. The IEP also violated IDEA because Mrs. Brenneise was not permitted to

---

[4] The School District thought ACES was responsible for academic content, but Nicole Luke, the director of ACES, did not believe it was her obligation. (Luke has a special education credential from New York.) ACES had been providing support services but Mrs. Brenneise handled the lessons. *See e.g.,* AR 5338, 5392, 5410-16. The School District stated that it would not have approved ACES if it had known it did not have qualified teachers available. *See e.g.,* AR 5403-08, 5601-03.

[5] The Court agrees with the School District that it would have been more appropriate to make this request in a motion for summary judgment. Nonetheless, the briefs fully explored the legal issues and the parties cited the relevant parts of the administrative record, thus, the flaw is not fatal.

participate in the decision-making process about T.B.'s transition from his home program to a full day at school. This motion seeks an appropriate remedy.

When a material violation of IDEA occurs, the Court has broad discretion to fashion an equitable remedy. 20 U.S.C. § 1415(i)(2)(C)(iii) ("the court . . . shall grant such relief as the court determines is appropriate"); *Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369-70 (1985); *Parents of Student W. v. Puyallup Sch. Dist., No. 3*, 31 F.3d 1489, 1496 (9th Cir. 1994). One form of relief is "compensatory education," where the Court orders the school to provide the *services* that the student should have received under a proper IEP.[6] *Parents of Student W.*, 31 F.3d at 1496; *Pihl v. Mass. Dep't of Educ.*, 9 F.3d 184, 188-89 & n.8 (1st Cir. 1993); *Valerie J. v. Derry Coop. Sch. Dist.*, 771 F. Supp. 483, 490-91 (D.N.H. 1991). The purpose of the award is to put the student in the same position he would have been in had he received the appropriate education from the school district in the first place. *R.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1125 (9th Cir. 2011); *Miener v. Missouri*, 800 F.2d 749, 753 (8th Cir. 1986).

The Court considers the conduct of the parties because "equitable considerations are relevant in fashioning relief." *Burlington*, 471 U.S. at 374; *accord Forest Grove Sch. Dist. v. T.A.*, 129 S. Ct. 2484, 2496 (2009); *Ashland Sch. Dist. v. Parents of Student E.H.*, 587 F.3d 1175, 1183 (9th Cir. 2009); *W.G.*, 960 F.2d at 1486. The Court therefore considers whether a party's conduct frustrated or advanced the statutory objectives. *Doe v. Brookline Sch. Comm.*, 722 F.2d 910, 916 (1st Cir. 1983). It will be a "rare case when compensatory education is not appropriate," but the fact-specific analysis of the equities may demonstrate that such relief is not appropriate. *Parents of Student W.*, 31 F.3d at 1497 (when parents rejected summer school and extra tutoring, but student was able to graduate from high school, an award of compensatory education was not appropriate).

///

---

[6] T.B. now resides in Minnesota and is in the eleventh grade. IDEA's equitable remedies are available after a student has left the school district and even after he ages out of the public school system. *Hale v. Poplar Bluffs R-I Sch. Dist.*, 280 F.3d 831 (8th Cir. 2002); *Pihl*, 9 F.3d at 189-90; *Lewis Cass Intermediate Sch. Dist. v. M.K.*, 290 F. Supp. 2d 832, 838 (W.D. Mich. 2003) ("while a school district typically has no continuing obligation to provide FAPE to the child of a parent who has moved out of the district, a school district nonetheless may be required to compensate a student for any IDEA violations that occurred before the move.").

A. **STANDARD OF REVIEW**

In reviewing the ALJ's decision, the Court receives the records from the administrative proceedings, hears additional evidence at the request of a party, and bases its decision on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2). The Court gives "particular deference" to "thorough and careful" findings by the ALJ, recognizing that the "fact-intensive nature of a special education eligibility determination coupled with considerations of judicial economy render a more deferential approach appropriate." *R.B.*, 496 F.3d at 937 & n.1 (quoting *Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994) and *Hood v. Encinitas Union Sch. Dist.*, 486 F.3d 1099, 1104 n.4 (9th Cir. 2007)). In its June 2010 Order, the Court held that the ALJ conducted a careful and thorough review. The Court therefore gives her findings particular deference.

As the party challenging the ALJ's decision, the Brenneises bear the burden of demonstrating that the ALJ erred. *L.M. v. Capistrano Unified Sch. Dist.*, 556 F.3d 900, 910 (9th Cir. 2009).

B. **ALJ'S DECISION TO DENY COMPENSATORY EDUCATION**

The ALJ held that T.B. was not entitled to an award of compensatory education.[7]

> The evidence does not support a finding of any need for compensatory education or instruction. Although it is true that Student was unable to attend a school based program due to the inappropriate IEPS, there was no evidence that he lost educational benefit as a result of his "stay put" placement. Student contends that Student made significant educational progress in his home program, and the District does not dispute that contention. Student's "stay put" program was a continuation of his home program of the three previous years, and the District provided a panoply of DIS services and one-to-one behavioral assistance/instruction. In fact, Student was receiving more hours of DIS services during stay put than he would have received under the December 4 IEP. Student made no showing that he lost any educational benefit from continuing his home program while this case was pending. Indeed, Student insisted that his home program remain his "stay put" placement when he signed the July 2006 IEP. ALJ Decision at 72 (LC ¶ 60).

---

[7]The School District argues the Court lacks subject matter jurisdiction on this issue because the Brenneises failed to exhaust their administrative remedies as to their request for 440 hours of compensatory education. *Hoeft v. Tucson Unified Sch. Dist.*, 967 F.2d 1298, 1302-03 (9th Cir. 1992); *see Smith v. Robinson*, 468 U.S. 992, 1011-12 (1984) (setting forth policy reasons to require parents to exhaust remedies before challenging an IEP in court, under the statute that preceded IDEA); *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1200 (9th Cir. 2007); *but see Payne v. Peninsula Sch. Dist.*, 598 F.3d 1123, 1125 n.2 (9th Cir. 2010) (questioning whether exhaustion is jurisdictional after Supreme Court held in *Jones v. Bock*, 549 U.S. 199 (2007) that failure to exhaust is an affirmative defense of a prisoner civil rights claim). The Court disagrees, and finds that the argument was "raised sufficiently." AR 6241-46; *Whittaker Corp. v. Execuair Corp.*, 953 F.2d 510, 515 (9th Cir. 1992) (finding party "raised sufficiently" the issue of remedies in administrative setting to allow federal court challenge to scope of the relief awarded); *accord Parents of Student W.*, 31 F.3d at 1496.

### C. DISCUSSION

The Brenneises rely on federal and state laws that require special education classes to be taught by a teacher who holds an appropriate special education credential, to support their position that T.B. is entitled to 440 hours of academic instruction from an appropriately credentialed teacher. 20 U.S.C. § 1401(10)(B); Cal. Code Regs. tit. 5, §§ 3053(c) & 80046.5 (2011). Because T.B. was not able to attend school safely, "it was left to T.B.'s mother to provide him whatever academic instruction she could." Mot. Br. at 7. Mrs. Brenneise does not have a general education teaching credential, much less a special education credential to address the needs of an autistic student. The School District refused to share its academic curriculum. The Brenneises argue that whatever academic progress T.B. made as a result of his mother's efforts does not match the progress he would have made with a special education teacher; therefore, T.B. is entitled to 440 hours of academic instruction from an appropriately credentialed teacher.

The Brenneises point to the ALJ's observation that Mrs. Brenneise spent a great deal of time driving T.B. to various appointments and that it was "unclear as to how much actual instruction" she actually provided. ALJ Decision at 55 (FF ¶ 247). They argue this finding undermines the ALJ's decision to deny compensatory education services.

The Brenneises further challenge the ALJ's finding that Mrs. Brenneise "chose" to "home school" T.B. because it was the School District's responsibility to teach T.B. ALJ Decision at 74 (LC ¶ 65). The Brenneises faced a "Hobson's choice" of either sending T.B. to public school under the proposed IEP without a nurse for the G-tube feedings, but where he would receive academic instruction from a properly credentialed teacher, *or* keep him physically safe at home where his mother would do her best to teach academic content. They describe the "stay put" as the "lesser of two evils." *Maine Sch. Admin. Dist. No. 35 v. Mr. R*, 321 F.3d 9, 19-20 (1st Cir. 2003).

The Court denies the Brenneises' motion for compensatory education for two reasons. First, the record shows that T.B. benefitted from the so-called "garage school" at home. Second, the equities demonstrate that compensatory education is not required.

"[A] child's claim for compensatory education begins to accrue when his or her IEP is so inappropriate that the child is receiving *no real education benefit*." *Id*. at 18 (emphasis added). A

FAPE provides a "basic floor of opportunity" through an individually designed program to offer a "meaningful educational benefit" to the child and does not guarantee a "potential-maximizing education." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 197 n.21, 201 (1982); *N.B. v. Hellgate Elementary Sch. Dist.*, 541 F.3d 1202, 1213 (9th Cir. 2008); *Blake C. v. Dep't of Educ.,* 593 F. Supp. 2d 1199, 1205-07 (D. Haw. 2009).

The Court is aware that T.B. was performing below grade level in most academic subjects. *E.g.*, AR 3353 (ESY IEP July 2006 refers to levels of academic performance and finds "areas of need" include reading, written language, and math); *id.* at 3382 ("As of 02/29/2006, instructional reading level was grade 4.0"); *id.* at 3384 (setting math goal for word problems with money); *see* AR 3035 (Letter from attorney, dated June 30, 2006, asserts that when T.B. was taken out of public school in 2003, he was "far, far behind in all academic areas"). The 2006-2007 school year marked T.B.'s sixth year in elementary school, but he had the math and reading skills of a third or fourth grade student. AR 3155-3156 (Academic Assessment of Reading and Math, indicated grade 3.0 or 4.0 in reading, dated May 31, 2005); ALJ Decision at 28 (FF ¶ 123) ("Student had been out of school in a home program for approximately three years and was far behind his grade level in reading, writing and math).[8] Using "regular advancement from grade to grade" as the sole indication of "satisfactory progress" is not appropriate, however, because "the limitations imposed by the child's disability" must be taken into account. *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 130 (2d Cir. 1998) (internal quotation marks and citations omitted); *In re Conklin*, 946 F.2d 306, 313 (4th Cir. 1991) (same).

///

---

[8]Though the Brenneises challenge the adequacy of the assessment in their IDEA cause of action, there is no dispute that T.B.'s reading and math levels were at approximately a third grade level as of August 2006. ALJ Decision at 66 (LC ¶ 34).

The record contains persuasive evidence that T.B. benefitted from the "garage school."[9] Mrs. Brenneise used the draft IEPs to shape her lesson plans and prepared written progress reports to document his success. Mrs. Brenneise stated that she had been an effective teacher despite her lack of credentials. AR 3249-3278 (mother's chart, 2005-2006 progress update, including improvement in math skills; reading at fifth grade level; student "made at least one year's growth" in language arts/word recognition; "made at least two full years progress in oral and silent reading comprehension"); AR 3142-43 (progress report prepared by mother, dated July 12, 2006, describes daily "garage school" attendance where T.B. "mastered his academic" goals and objectives set out in the IEP; "Please note that these goals were based on the supposition that [T.B.] would be in public school setting with a teacher – since instruction took place at home and was directed by [his] mother, some goals could not be addressed or implemented as written."; concluding that T.B. "has made wonderful progress with 1:1 direct instruction with few auditory distractions in 'garage school'" and noting "his dramatically increased reading abilities"); AR 8550-55 (mother's progress report for summer 2006, dated Aug. 2006, describes her role in modifying educational curriculum for aids to use and her role in pre-teaching and re-teaching content; and evaluates the goals from the ESY IEP that T.B. met, exceeded, failed to meet, or that could not be measured); AR 08571-76 (mother's progress update from July 27, 2006 to May 6, 2007 states she tried "to provide an education program to [T.B.] to the best of her abilities"; stating he was succeeding at fifth grade levels in theater and science, and seventh grade in history, fourth grade in math); *see* AR 5104 (letter from attorney, dated Nov. 30, 2006, states: "Mrs. Brenneise (who you might recall is and has been

---

[9]The Brenneises object to evidence of progress *before* September 2006 as "unfair" because the parties settled the disputes concerning the three prior school years. The Court disagrees. T.B.'s performance during the four years he attended "garage school" is relevant to the request for compensatory education. The quality of education T.B. actually received is one factor in the totality of circumstances. The evidence shows that Mrs. Brenneise actively participated in T.B.'s education and her concentrated efforts succeeded. That fact bears on her request for a teacher certified by California in special education.

In addition, the Brenneises have not presented any evidence that T.B. suffered an educational deficit during 2006-2007, for example, an assessment analyzing his capabilities or the effect of the absence of an appropriately credentialed teacher. *Hogan*, 645 F. Supp. 2d at 573-75 (parents bear burden of proof that Court should award compensatory education on particular facts).

1  [T.B.'s] teacher for the past 3+ years)" and T.B. "made no progress while educated by the District,
2  and made incredible, demonstrable progress when educated by his mother.").

3  Mrs. Brenneise's positive observations about T.B.'s progress were confirmed by independent
4  testing.  T.B. was assessed by an expert, Dr. Lynne Thorpe, in February 2006, who concluded that
5  the English services he received, including "a 7-hour school day in 'garage school'" had improved
6  his academic performance in some of the language arts.  AR 2665.  Dr. Thorpe reported Mrs.
7  Brenneise's statement that "she 'had a feeling that [T.B.] had made great improvement while
8  working with her and his tutor at home.'" *Id.* at 2666.  Dr. Thorpe's tests showed T.B. improved in
9  most areas (*e.g.*, reading comprehension, phonics mastery) but other areas remained the same or
10 declined (*e.g.*, listening comprehension).  *Id.* at 2671-72; *accord* AR 3035 (Letter from attorney,
11 dated June 30, 2006, stating that by 2006, "District assessors have told [Mrs. Brenneise] that [T.B.]
12 is testing at or near Grade Level on standardized assessments that have been administered.").

13 The Brenneises rely on the following statement by Dr. Thorpe:  "Given that this success has
14 been achieved primarily under the tutelage of Mrs. Breneisse, imagine what heights [T.B.] could
15 achieve given the opportunity to consistently develop his literacy skills with a trained professional in
16 dyslexia and dysgraphia."  AR 2673.  Dr. Thorpe's statement, however, does not satisfy the parents'
17 burden to overturn the ALJ's thorough findings and wise conclusions.  *Cf. Hogan v. Fairfax Cnty.*
18 *Sch. Bd.*, 645 F. Supp. 2d 554, 574-75 (E.D. Va. 2009) (district court awarded compensatory
19 education because parents documented student's history of regressing academically when not
20 attending school).  There is a strong appeal to "the common-sense proposition that a missed year of
21 school must have had some deleterious effect on the Student that compensatory education will go
22 some way toward remedying."  *Hogan*, 645 F. Supp. 2d at 574.  But that assumption is not a
23 substitute for "tangible evidence showing a precisely measurable need for the equitable remedy of
24 compensatory education."  *Id.*  Here, Mrs. Brenneise committed her full attention to ensure that T.B.
25 learned behaviors, strategies, study skills, and academic content in "garage school."  She crafted an
26 40 hour per week educational program that suited T.B.'s special needs.  *E.g.*, AR 5633, 8571
27 (including music therapy and field trips).  Consequently, there is sufficient evidence in the record to
28 sustain the ALJ's decision to deny compensatory education because T.B. "made significant

1  educational progress in his home program" and he "made no showing that he lost any educational
2  benefit from continuing in his home program while this case was pending." ALJ Decision at 72 (LC
3  ¶ 60). The IDEA does not contain an idealized aspiration to maximize a student's potential.
4  *Rowley*, 458 U.S. at 197 n.21 ("appropriate" does not mean "a potential-maximizing education");
5  *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1314 (9th Cir. 1987) ("An appropriate public
6  education does not mean the absolutely best" education).

7       The Court also denies the motion because the equities do not tip in the Brenneises' favor.
8  Mrs. Brenneise insisted that the ESY IEP July 2006 constitute the "stay put" for T.B.'s 2006-2007
9  school year. AR 3231 (July 13, 2006 email from attorney stating need to document stay put services
10 after Coronado Academy scheduled to end August 3; "Mrs. Brenneise is agreeing to services that
11 will continue until those services are modified by a subsequent, mutually agreeable IEP."); AR
12 3349-50 (July 15, 2006 email from attorney stating, "we took it upon ourselves to make sure that
13 there is no misunderstanding about [T.B's] stay put, so that we don't create more litigation for
14 ourselves. *The stay put is not negotiable*. [T.B.] either goes to school or keeps his existing home
15 program. Period, the end."). When the IEP team honors a parents' specific request – thereby
16 following the IDEA's prescription to involve the parents in developing the educational program and
17 assessing its effectiveness –  the parents cannot in good faith blame the school district for failing to
18 comply with the statute. *Doe ex rel. Doe v. Defendant I*, 898 F.2d 1186, 1189 (6th Cir. 1990);
19 *Burlington*, 471 U.S. at 368 (the "Act emphasizes the participation of the parents in developing the
20 child's education program and assessing its effectiveness").

21      Here, the School District took Mrs. Brenneise at her word that she was T.B.'s teacher and
22 that T.B. was progressing. *E.g.*, AR 3143 (signing progress report as "Teacher / Parent"); AR 5381
23 (letter from attorney, stating Mrs. Brenneise "has been [T.B.'s] *one and only teacher, providing*
24 *curriculum and instruction for [T.B.]*, in that home program, since October 13, 2003") (emphasis in
25 original); AR 5418. For example, when Mrs. Brenneise sought help by requesting the curriculum, it
26 was so she could teach T.B. at home. *E.g.*, AR 4850 & 4853 (Mrs. Brenneise requested the
27 "English, Reading, Math, Social Studies, History and Study Skills" curriculum "to be implemented
28 by her" to support T.B.'s academic transition from a home to a school program).

It is clear on the face of the record that Mrs. Brenneise is a devoted and dedicated parent. She hired experienced counsel to advocate her position and negotiate with the School District. It is equally obvious that she had a difficult relationship with the School District. The IEP team tried in good faith to accommodate her detailed demands and diligently tried to find a placement that met T.B.'s special needs. *Cf. Maine*, 321 F.3d at 19 (compensatory education is appropriate when school district was derelict in providing appropriate educational services). On this record, the argument that Mrs. Brenneise was between a rock and hard place falls flat. *Id.* at 19 n.7 (noting that a school district could avoid liability for compensatory education services by seeking compromise with parents on interim placement for special education student); *Hogan*, 645 F. Supp. 2d at 572-73 (noting that award of compensatory education should not "unfairly penalize a school district that was only partially responsible for the denial of a FAPE"). This is not a case in which the student received no education during the pendency of the administrative proceedings. *Cf. Murphy v. Timberlane Reg'l Sch. Dist.*, 22 F.3d 1186, 1188 (1st Cir. 1994) (child received no educational services for two years); *Meiner*, 800 F.2d at 751-54 (child institutionalized with no educational services for three years). Instead, Mrs. Brenneise, with the assistance of counsel, negotiated a detailed stay put placement that met her precise demands. *E.g.*, AR 3387-91 (Mrs. Brenneise's chart specifies exact services in the stay put). Throughout the year, T.B. received a broad range of specialized services to help him succeed in school. *E.g.*, AR 3381 (behavioral aids teach social emotional skills that enable T.B. to learn). On this record, the lack of a credentialed teacher does not create a categorical right to "day-for-day compensation." *Parents of Student W.*, 31 F.3d at 1497.

In sum, the preponderance of the evidence supports the ALJ's decision to deny T.B. compensatory education services to remedy the denial of FAPE for the 2006-2007 school year. The Court defers to the ALJ's fact and policy findings because she presided over a lengthy hearing, reviewed hundreds of pages of documents, and applied her expertise to the case. *Union Sch. Dist.*, 15 F.3d at 1524. The Court also exercises its independent judgment to balance the equities and denies the request for compensatory education. *See Forest Grove*, 129 S. Ct. at 2496; *Ashland*, 587 F.3d at 1182.

///

### III. RULE 54(B) MOTION

The Brenneises also ask the Court to enter partial judgment in their favor on the School District's first cause of action based upon the Court's June 2010 Order. The Brenneises hint that they may drop some of the issues in their own IDEA claim; however, their separate claims brought under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Americans with Disabilities Act of 1990, 42 U.S.C. § 12131 remain. SAC ¶¶ 33-62 (fourth to seventh causes of action).

A district court may "direct entry of a final judgment as to one or more, but fewer than all, claims or parties only when the court expressly determines that there is no just reason for delay." Fed. R. Civ. P. 54(b). "Judgments under Rule 54(b) must be reserved for the unusual case in which the costs and risks of multiplying the number or proceedings and of overcrowding the appellate docket are outbalanced by pressing needs of the litigants for an early and separate judgment as to some claims or parties." *Morrison-Knudsen Co., Inc. v. Archer*, 655 F.2d 962, 965 (9th Cir. 1981). "A similarity of legal or factual issues will weigh heavily against entry of judgment under the rule, and in such cases a Rule 54(b) order will be proper only where necessary to avoid a harsh and unjust result, documented by further and specific findings." *Id.*

The Brenneises have completely failed to satisfy Rule 54(b)'s requirements. The IDEA claims are not separate from each other nor distinct from the pending civil rights claims, but are wholly dependent upon the same facts concerning T.B.'s special education needs in 2006-2007. The Court denies the motion in this routine case. *Wood v. GCC Bend, LLC*, 422 F.3d 873, 879 (9th Cir. 2005).

### IV. PRETRIAL SCHEDULE

T.B. is now in the eleventh grade. The Court's review of the administrative decision will probably be resolved by summary judgment motion. *See Capistrano Unified Sch. Dist. v. Wartenberg ex rel. Wartenberg*, 59 F.3d 884, 890-92 (9th Cir. 1995); *Ojai*, 4 F.3d at 1472. To ensure that this case is resolved promptly, the parties shall, within three (3) days of the filing of this Order, contact Judge McCurine's chambers to schedule a case management conference. In particular, a motion cut-off date should be established in the very near future on the Brenneises' first

cause of action under IDEA. The parties are well-versed with the issues, and there is no reason to delay judicial review of the administrative decision. (The parties' respective claims for attorney's fees will, of course, be resolved after the Court resolves the merits of the IDEA issues.).

The Brenneises indicate that they may be able to settle the remaining issues, and to that end, the Court reminds counsel that Magistrate Judge McCurine is available to assist them in that effort.

## V. CONCLUSION

For the reasons set forth above, the Court **DENIES** the motion for an award of compensatory education and **DENIES** the motion for entry of partial final judgment. [Doc. No. 119] **IT IS FURTHER ORDERED** that within three (3) days of the filing of this Order, the parties shall contact Magistrate Judge William McCurine's chambers to schedule a case management conference.

**IT IS SO ORDERED**.

DATED: March 30, 2011

Hon. Michael M. Anello
United States District Judge