1
2
3
4
5
6
7
8
9
10

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| 11  T.B., a minor, by and through his<br>*Guardian ad Litem*, ALLISON<br>12  BRENNEISE, and ROBERT<br>BRENNEISE, | CASE NO. 08CV28-MMA (WMc)<br><br>[Consolidated Action] |
| 13                                Plaintiffs, | |
| 14           vs. | **ORDER GRANTING SCHOOL** |
| 15 | **DISTRICT'S MOTION FOR**<br>**SUMMARY JUDGMENT ON** |
| 16 | **FOURTH, FIFTH, AND SEVENTH**<br>**CLAIMS AND DENYING** |
| 17  SAN DIEGO UNIFIED SCHOOL<br>DISTRICT, | **BRENNEISES' CROSS MOTION**<br>**FOR PARTIAL SUMMARY** |
| 18                                Defendant. | **JUDGMENT**<br><br>[Doc. Nos. 208 & 209] |
| 19 | |
| 20  SAN DIEGO UNIFIED SCHOOL<br>DISTRICT, | |
| 21                                Plaintiff, | |
| 22           vs. | |
| 23  BRENNEISE, et al, | |
| 24                                Defendants. | |

25      Currently before the Court are cross-motions for summary judgment on the remaining

26 causes of action in this special education case.  The Court found the motions suitable for

27 decision without oral argument.  Local Civ. R. 7.1(d)(1).  In previous orders, the Court

28 resolved the issues based upon the Individuals with Disabilities Education Act ("IDEA"), 20

U.S.C. §§ 1400, *et seq.*; however, the Brenneises (mother, father, and son) also allege that the San Diego Unified School District ("School District") violated § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 791 *et seq.*, and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.* The Brenneises seek money damages for the alleged discrimination against their disabled son (T.B.), failure to implement the administrative decision, and retaliation against the mother's aggressive advocacy. [Second Am. Compl. ("SAC") ¶¶ 33-5, 58-62.] Although the School District raises several issues in its motion, the Court addresses only the *mens rea* element because it resolves the remaining Rehabilitation Act and ADA claims in their entirety. The Brenneises fail to present evidence that the School District acted with the requisite intent; therefore, the Court **GRANTS** the School District's motion for summary judgment on the Brenneises' fourth, fifth, and seventh causes of action. Consequently, the Court **DENIES** the Brenneises' motion for partial summary judgement on their fourth cause of action.

## I.    BACKGROUND

The Brenneises' operative complaint was filed in May 2009. [Doc. No. 65] The Rehabilitation and ADA claims are sometimes referred to as the "civil rights" claims to distinguish them from the IDEA claims that were adjudicated in an administrative proceeding.[1] All claims arise out of the same facts. The remaining claims primarily focus on the School District's efforts to accommodate T.B.'s need for G-Tube feedings at school. [SAC ¶¶ 34-41 (fourth claim).] A second claim challenges whether the School District failed to implement the administrative law judge's ("ALJ") remedial order on the G-Tube feeding procedure as well as the order to fund occupational therapy from T.B.'s current provider (School Options) during his transition into public school. [*Id.* ¶¶ 35-38, 44-48 (fifth claim).] The Brenneises also allege that the School District retaliated against Mrs. Brenneise's advocacy for T.B. [*Id.* ¶¶ 59-60 (seventh claim).]

---

[1] The parties lodged the Administrative Record ("AR") from the IDEA hearing under seal. The administrative decision ("OAH Decision") consists of numbered paragraphs. "FF" refers to factual findings and "LC" to the legal conclusions in that decision, which is attached as Exhibit A to the Brenneises' original Complaint. [Doc. No. 1]

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### A. <u>Facts Leading Up to OAH Decision</u>

T.B. has autism and Phenylketonuria ("PKU"), which caused brain damage and physical difficulties.  [OAH Dec. FF ¶¶ 3-6.]  He cannot metabolize a common amino acid found in protein; therefore, he must follow a closely-monitored low-protein diet that is supplemented with a special formula two or more times a day.  T.B. ingests the formula through a gastrostomy tube ("G-Tube") which  is "a surgically implanted vessel that leads from a plug on the surface of his skin through a tube into his stomach."  [*Id.* FF ¶ 216.]  The formula must be measured and mixed, poured into a syringe, and inserted into the G-tube, which is then flushed clean with water.  [*E.g., id.*]  This process takes about fifteen minutes, but T.B. may need to rest briefly if nausea occurs.  T.B.'s motor skills, coordination, and attention span were impaired, and an adult supervised him when he measured and mixed the formula.  [*E.g., id.* FF ¶¶ 42, 87.]

T.B. had been home-schooled since 2003, where his mother helped him with the G-tube feedings.  [*E.g.*, *id.* FF ¶ 129.]

In 2006, the parties tried but failed to agree upon an "individualized education program" ("IEP") that would address the full range of T.B.'s unique educational needs and goals in a public classroom for the 2006-2007 school year.  The parties committed many hours to meetings with several participants, engaged in extensive discussion, exchanged detailed correspondence, and valiantly and in good faith tried to resolve their differences.  It is not necessary to outline those facts in detail as the paper trail is part of the record.  [*E.g.* Glynn Decl. ¶¶ 4-12; OAH Dec. FF ¶¶ 1-263; DSMF 117-20; PSMF Reply 158-60.][2]  With

---

[2] With respect to the civil rights claims, the Brenneises are the plaintiffs, and their own statement of material facts are cited with the appropriate paragraph number as  "PSMF" [# 208-2]; "PUMF" [Table 1 of # 217-1]; "PSMF Opp." [Table 2 of # 217-1]; and "PSMF Reply." [223-1].  The School District's are cited as "DSMF" [# 209-2]; "DSMF Opp."[# 216-1]; and "DSMF Reply." [# 226-1]

When the Court cites a statement of material fact in this Order, it has considered and overruled the opponent's objection.  In particular, the Court overrules the Brenneises' repeated relevance objection to the School District's evidence.  The entire course of conduct is relevant to ascertain whether the School District acted with deliberate indifference.  *See Zukle v. Regents of the Univ. of Cal.*, 166 F.3d 1041, 1048 (9th Cir. 1999); *Wiles v. Dep't of Educ.*, 593 F. Supp.

(continued...)

1   regard to specialized health care services, the August and December 2006 IEPs offered eight

2   hours of nurse services for the school year.  Three hours of consultation and training were

3   designated for the first month, and five hours for the rest of the year as needed.  [PSMF Opp.

4   29-32, 48-51.]  The 2006 IEPs did not identify the person who would be responsible for G-

5   Tube feedings, as the School District contended the procedures would be detailed in a health

6   care management plan that had not yet been written.  [OAH Dec. FF ¶¶ 216-19, 223, 229; LC

7   ¶¶ 36-48.]  At the time the School District offered the IEPs for T.B.'s 2006-2007 school year,

8   all of the available information established that T.B. could independently complete the task if

9   he had an adult to prompt him to stay on task, but that he did not need a nurse to personally

10   assist him.  [DSMF 11, 87; PSMF Reply 133.]  The entire process took approximately twenty

11   minutes.

12       Mrs. Brenneise raised a number of concerns about various services, but did not

13   specifically object to the accommodations outlined for T.B.'s G-Tube feeding.  [PSMF Opp.

14   34, 38-40, 55, 77-78, 80; PSMF Reply 106 (expressing concerns for formula T.B. spilled on

15   his clothes), 144, 154 (Brenneises' first raised nurse issue while preparing for the

16   administrative hearing in 2007); Brenneise Decl. ¶ 6 (expressing concern for privacy during

17   feedings).]

18       When the parties could not agree on many issues concerning appropriate services,

19   they submitted their disputes to the California Office of Administrative Hearings ("OAH").

20   In the interim, the parties agreed that T.B. would continue to be educated at home by his

21   mother, while the School District paid for a variety of support services, including

---

[2](...continued)

2d 1176, 1186-88 (D. Haw. 2008) (examining five-year relationship, including level of services provided, number of staff and teachers involved, amount of funds expended, extent of discussion, and parent's unreasonable demands to determine school did not act with deliberate indifference).  For example, the Brenneises object to the School District's evidence that it provided a multitude of other comprehensive services to ensure T.B. a FAPE.  They argue the evidence is irrelevant to T.B.'s specific need for supervision during G-Tube feedings. The Court overrules the objection, finding that the entire record relevant to the issue of the School District's intent.  The School District's conscientious actions to accommodate *all* of T.B.'s unique needs with a wide array of services indicates that it was not discriminating against his disability or otherwise seeking to exclude him from school because of his disability.

1   occupational therapy and a full-time behavioral aide.

2          The administrative hearings lasted twenty-seven days in May to July 2007 and

3   amassed an enormous record.  On October 5, 2007, the ALJ decided that T.B. was entitled to

4   relief on three issues, but concluded that the School District prevailed on the other fifteen

5   issues in the case.

6          In the relevant part of its lengthy decision, the ALJ held that the School District

7   denied T.B. a FAPE for the 2006-2007 school year because it failed to develop a health care

8   plan that would enable him to attend school safely.  The ALJ found that T.B.'s G-Tube

9   feeding was a "specialized" physical health care service under both federal and state law and

10  must be performed by an individual with medical training.  [OAH Dec. LC ¶ 40-42 (citing

11  FF ¶¶ 216-19).]  Moreover, the School District's own policies, which were published on the

12  public website, recognized that treatment.  [*Id.* LC ¶ 42.]  Yet the IEP did not identify the

13  classification of the employee who would help T.B. with his G-tube feedings, and the BSA

14  was not the appropriate person.  [*Id.* LC ¶¶ 47-48.]  The ALJ held this violated California

15  law, which permits only two types of employees to provide specialized physical health care

16  services:  (1) qualified persons who possess an appropriate credential; and (2) qualified

17  designated school personnel trained in the administration of specialized physical health care

18  if they perform those services under the supervision of a credentialed school nurse or

19  licensed physician.  [*Id.* FF ¶ 235.]

20          As a remedy, the ALJ added the following language to the December 2006 IEP:
        G-Tube feedings will be scheduled daily in the nurse's office.  A school nurse
21      will be present and will personally assist the student with the student's G-Tube
        feeding.  The G-Tube feeding will occur at the time(s) and in the manner
22      designated in a doctor's order from Student's current physician.  Student's
        mother will be responsible for providing the school nurse with a current
23      doctor's order specifying the time(s) of the G-Tube feeding and the amount of
        formula to be used in the feeding(s), and for providing updated doctor's orders
24      whenever there is any change in the G-Tube feedings.

25  [*Id.* at p. 74, ¶ 1.]  Nonetheless, the ALJ emphasized that:

26          [N]othing in this Decision is intended to prevent the District from proposing, in
        a future IEP, that another classification of employee assist Student with the
27      feedings, provided that the assistant meets the requirements of Education Code
        section 49423.5. In addition, nothing in this Decision is intended to limit the
28      classification of employee that may be designated pursuant to that code section.
        This Decision is simply based on the finding that, at the present time and in the

present case, the District failed to make an evidentiary showing that the three hours of training provided for District staff in the December 4 [2006] IEP would qualify Student's one-to-one behavioral aide to perform specialized physical health care services.

[*Id.* LC ¶ 62.]  The ALJ confirmed that T.B. did not need one-to-one nurse assistance to implement the other aspects of the health plan.  [*Id.* LC ¶ 61.]

The other issue related to the proposed plan to transition T.B. from his home program into a full-time school program.  The ALJ modified T.B.'s transition plan to provide that until he reached phase four of the plan (*i.e.*, attending a full day at school), his District-funded services would "continue with his current NPA providers."  [*Id.* at p. 74, ¶ 3.]  T.B. had been receiving occupational therapy ("OT") from School Options, a private company owned by Chris Vinceneux.

**B.  Facts After the OAH Decision**

The OAH announced its decision on the 2006 IEPs on October 5, 2007.  By that time, a new school year (2007-2008) had begun.  The parties continued to discuss modifications to an IEP that would comply with the OAH Decision and govern the new school year.[3]  The School District sought to place T.B. at Wangenheim Middle School.

On October 15, 2007, the School District modified the proposed IEP to include the language required by the OAH Decision on two topics.  [Wyner Decl., Ex. 2.]  First, in the health/nursing services delivery section, the October 2007 IEP stated that the G-Tube feeding would occur in the nurse's office, and that a nurse would be present to "personally assist" T.B.  *Id.*  It further specified that the School District would provide "3 hours consultation/training prior to [T.B.'s] starting school" and "5 hours consultation per year as needed."  [*Id.*]  The Brenneises emphasize that this was the same number of hours (eight) offered in the prior December 2006 IEP and that the OAH Decision specifically held that three hours was not sufficient for the nurse to train the behavioral aide to supervise T.B.'s G-

_____

[3] Throughout October 2007, the wildfires that swept San Diego County as well as Mrs. Brenneise's knee surgery delayed implementation of the OAH Decision.  [*E.g.*, Doctors Decl. ¶ 33; Glynn Decl. ¶¶ 13-23.]  Mrs. Brenneise's demand that communications be in writing also slowed progress.  [Glynn ¶ 14 & Ex. C.]

1   Tube feedings.  [OAH Dec. LC ¶ 62 ("based on the finding that, at the present time and in

2   the present case, the School District failed to make an evidentiary showing that the three

3   hours of training provided for District staff in the December 4 IEP would qualify Student's

4   one-to-one behavioral aide to perform specialized physical health care services.").]

5       In the transition plan section, the School District added that the nurse would train

6   school staff about the feeding procedures, with Mrs. Brenneise's input.  [Wyner Decl., Ex.

7   13.]  One hour was provided for all staff, with an additional two hours for the staff that

8   would work directly with T.B.  [*Id.* at p. 93.]  The IEP also stated that "health training will be

9   ongoing throughout the year, to ensure that all staff understand and can implement this

10  critical information."  [*Id.* at p. 98.]

11      Second, the October 2007 IEP identified School Options as a service provider until

12  T.B. made the complete transition into a full-day at public school.  [Wyner Decl., Ex. 2.]

13  This addition was required by the OAH Decision that allowed T.B. to receive services from

14  his current NPA providers.

15      In order to facilitate T.B.'s transition from home to school, the transition plan for the

16  October 2007 IEP also added that the School District's Occupational Therapist (Phyllis

17  Gahan) would observe two of T.B.'s sessions with School Options; and that both OTs would

18  visit Wangenheim to make recommendations about the equipment.  [Wyner Decl., Ex. 13.]

19  The IEP did not alter the number of hours of direct occupational therapy services.  [*Id.* (60

20  minutes per week in a small group; 30 minutes per week with 1 or 2 students; and 10 hours

21  annual consultation time).]

22      On October 31, 2007, the Brenneises formally rejected the modified offer as being

23  non-compliant with the OAH Decision.  [Wyner Decl., Ex. 21.]  They based the objection on

24  their desire to have School Options continue to provide OT services.  [*Id.*]  The Brenneises

25  did not at that time object to the offer of nursing services.  [*Id.*]

26      On November 8, 2007, the School District filed a motion asking the ALJ to modify

27  the requirement to continue services from the non-public agency because new facts showed

28  School Options was not certified with the California Department of Education.  On

1   November 21, 2007, the ALJ summarily denied that request because "[t]hat relief is not

2   proper." [Wyner Decl., Ex. 14 at 2.] In addition, the ALJ held that all parties agreed to fund

3   T.B.'s current private providers and that agreement preempted any problem with School

4   Options' lack of certification. [*Id.*]

5         Next, the School District proposed a November 2007 IEP. Because of the passage of

6   time, this IEP fulfilled the IDEA requirement to review and revise each student's IEP

7   annually. [Wyner Decl., Ex. 4; Glynn Supp. Decl., Ex. NN.]; 20 U.S.C. § 1414(d)(2), (4).

8         On November 29, 2007, the parties convened an IEP Team Meeting to discuss the

9   services T.B. would receive at Wangenheim. [Glynn Supp. Decl., Ex. NN.] The IEP

10  provided eight hours of nurse services. The School District proposed that the nurse both

11  "personally assist" T.B. with the procedure, and train the behavioral support assistant

12  ("BSA"), during the first week of school in the nurse's office. The IEP coordinated the G-

13  Tube feeding with the four stages of T.B.'s transition plan. During the first, second, and

14  third phases when T.B. was attending school part-time, the school would provide a nurse

15  once a day; and then twice a day during the fourth phase, when T.B. would be spending a full

16  day at the public school. [Wyner Decl., Ex. 4.] Thereafter, the BSA would assist T.B. in the

17  nurse's office under her supervision. The nurse would continue to supervise to ensure the

18  aide was competent. [Glynn Supp. Decl., Ex. NN.] The nurse would also train other staff

19  members as back-ups. [*Id.* (Special Education Technicians or "SET" are qualified to provide

20  health care services at school).] The November 2007 IEP further provided nursing services

21  for one hour per month for the BSA to consult with the nurse and for the nurse to monitor the

22  BSA's performance. [*Id.*]

23        On December 14, 2007, Mrs. Brenneise rejected the proposal on the ground that it was

24  "wholly inconsistent" with the OAH Decision that T.B.'s G-Tube feedings be administered

25  and supervised by a nurse. [Glynn Decl., Ex JJ; Wyner Decl. ¶ 6; PUMF 10; Brenneise Decl.

26  ¶ 11.]

27        In response, the IEP Team re-convened on December 21, 2007 and the School District

28  increased the total nursing hours from eight to twelve for the year. [Glynn Decl., Ex. OO at

1  2a; DSMF 232-35.]

2      In February 2008, the School District sought administrative review of the November

3  2007 IEP, but that case was quickly dismissed when the Brenneises moved to Minnesota in

4  March 2008.  [Wyner Decl. ¶¶ 8, 14 & Exs. 11, 12; Doctors Decl. ¶ 58.]

5      In June 2010, this Court affirmed the OAH Decision in so far as the IEPs proposed in

6  2006 did not provide a FAPE as required by IDEA on the G-Tube feeding procedure, the

7  parents' participation in the transition plan, and continued reimbursement for OT services by

8  School Options.  The Brenneises did not pursue their IDEA claims on the other fifteen issues

9  adjudicated by the ALJ.

10      The Brenneises allege three claims pursuant to the Rehabilitation Act and ADA.  The

11  first claim concerns the specialized health services the School District offered to

12  accommodate T.B.'s G-Tube feedings.  The Brenneises contend the School District failed to

13  accommodate T.B.'s disability in the manner specified by California law because it failed to

14  provide a qualified individual to provide G-Tube feedings at school.  [PSMF 3-7.]  This

15  discrimination deprived T.B. of attending school with his peers, where he could engage in

16  sports, join clubs, and socialize with non-disabled students.  [PSMF 8.]  The Brenneises

17  allege that they were forced to move to Minnesota to secure T.B.'s education in the "least

18  restrictive environment."

19      The second claim concerns events that occurred after the administrative hearing.  The

20  Brenneises allege the School District failed to implement the OAH Decision by failing to

21  ensure the presence of a school nurse to personally assist T.B. with the G-tube feedings and

22  by failing to continue to provide occupational therapy services from School Options.  These

23  failures allegedly deprived T.B. of the educational benefit of attending public school.

24      The final claim alleges that the above violations constituted retaliation against the

25  Brenneises' aggressive advocacy to protect their civil rights.  [*E.g.*, Brenneise Decl. ¶ 2.]

26  **III.    LEGAL PRINCIPLES**

27      The IDEA expressly recognizes that children with disabilities may have co-existing

28  and overlapping rights and remedies under the ADA and § 504 of the Rehabilitation Act.  20

1    U.S.C. § 1415(l);  *Payne v. Peninsula Sch. Dist.*, 653 F.3d 863, 872 (9th Cir. 2011) (en

2    banc).  "The ADA and § 504 provide relief from *intentional* discrimination whereas the

3    IDEA provides relief from inappropriate placement decisions, regardless of discrimination."

4    *Brantley v. Indep. Sch. Dist. No. 625*, 936 F. Supp. 649, 656 (D. Minn. 1996) (emphasis

5    added).  "To prove discrimination in the education context, 'something more than a mere

6    failure to provide a 'free appropriate education' required by [IDEA] must be shown.'" *Sellers*

7    *v. Sch. Bd. of Manassas, Va.*, 141 F.3d 524, 529 (4th Cir. 1998) (quoting *Monahan v. Neb.*,

8    687 F.2d 1164, 1170 (8th Cir. 1982)); *Brantley*, 936 F. Supp. at 656.

9        **A.  IDEA**

10       "Among Congress's purposes in enacting the IDEA was 'to ensure that all children

11   with disabilities have available to them a free appropriate public education [("FAPE")] that

12   emphasizes special education and related services designed to meet their unique needs and

13   prepare them for further education, employment, and independent living.'"[4]  *Mark H. v.*

14   *Lemahieu*, 513 F.3d 922, 928 (9th Cir. 2008) (quoting 20 U.S.C. § 1400(d)(1)(A)).  The

15   statute provides for initial review by an ALJ with expertise in special education cases, who

16   hears testimony and issues a written decision on the merits.  An aggrieved party may then

17   seek judicial review.  20 U.S.C. § 141(i)(2)(A).

18       The IDEA "allows private causes of action only for prospective relief."  *Mark H.*, 513

19   F.3d at 929.  Compensatory damages are not available.  *Id.*; *Witte v. Clark Cnty. Sch.*

20   *Dist.*,197 F.3d 1271, 1275 (9th Cir. 1999) (IDEA does not allow money damages for pain

21   and suffering), *overruled in part on other grounds by Payne*, 653 F.3d at 870-71.

22   _____

23       [4] The IDEA "confers upon disabled students an enforceable substantive right to public
     education in participating States, and conditions federal financial assistance upon a State's
24   compliance with the substantive and procedural goals of the Act." *Honig v. Doe*, 484 U.S. 305,
     310 (1988) (citation and footnote omitted).  A "free appropriate public education" ("FAPE")
25   provides a "basic floor of opportunity" through an individually designed program to offer an
     "educational benefit" to the child.  *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v.*
26   *Rowley*, 458 U.S. 176, 201 (1982); *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th
     Cir. 1993).  FAPE is defined as special education and related services that (1) are provided
27   without charge, at public expense, and under public supervision and direction, (2) meet the
     standards of the State educational agency, (3) include an appropriate preschool, elementary
28   school, or secondary school education, and (4) are provided in accordance with an individualized
     education program.  20 U.S.C. § 1401(9).

08cv28

1    **B.  Rehabilitation Act § 504**

2         "While the IDEA focuses on the provision of appropriate public education to disabled

3    children, the Rehabilitation Act of 1973 more broadly addresses the provision of state

4    services to disabled individuals."  *Mark H.*, 513 F.3d at 929.  Section 504 of the

5    Rehabilitation Act states that no qualified individual with a disability "shall, solely by reason

6    of her or his disability, be excluded from participation in, be denied the benefits of, or be

7    subjected to discrimination" under any qualifying program or activity.  29 U.S.C. § 794(a).

8         "[T]he focus of the prohibition in § 504 is 'whether disabled persons were denied

9    meaningful access to state-provided services.'"  *Mark H.*, 513 F.3d at 937 (internal quotation

10   marks and citations omitted); *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996)

11   ("Rather than attempt to classify a type of discrimination as either 'deliberate' or 'disparate

12   impact,' the [Supreme] Court determined it was more useful to assess whether disabled

13   persons were denied 'meaningful access' to state-provided services.") (quoting *Alexander v.*

14   *Choate*, 469 U.S. 287, 302 (1985)).  Section 504 "require[s] *reasonable* modifications

15   necessary to correct for instances in which qualified disabled people are prevented from

16   enjoying 'meaningful access' to a benefit because of their disability."  *Mark H.*, 513 F.3d at

17   937-38 (citations omitted).

18        Pursuant to regulations, the Rehabilitation Act also requires the provision of a FAPE;

19   however, the definition is slightly different than the standard of the IDEA.  *Mark H.*, 513

20   F.3d at 929-30 (citing 34 C.F.R. § 104.33).  Disabled individuals must be placed in a "regular

21   educational environment," but if that is not possible, the alternative placement must be

22   "comparable" to that provided to non-disabled individuals.  *Id.* (citing 34 C.F.R. § 104.34).

23   Unlike a FAPE under the IDEA, "FAPE under § 504 is defined to require a comparison

24   between the manner in which the needs of disabled and non-disabled children are met, and

25   focuses on the 'design' of a child's educational program."  *Id.* at 933 (citations omitted).

26        One means of meeting the substantive portion of § 504 is to satisfy the FAPE

27   requirement of IDEA; however, plaintiffs "may not obtain damages simply by proving that

28   the IDEA FAPE requirements were not met."  *Id.*  The comparison requirement in a § 504

action means that "school districts need only design education programs for disabled persons that are intended to meet their educational needs to the *same* degree that the needs of nondisabled students are met, not more."  *Id.* at 936-37; *Sellers*, 141 F.3d at 529; *Monahan*, 687 F.2d at 1170-71 ("discrimination" requires "something more than an incorrect evaluation, or a substantively faulty individualized education plan, in order for liability to exist"); *Alex G. v. Bd. of Trs. of Davis Jt. Unified Sch. Dist.*, 387 F. Supp. 2d 1119, 1124 (E.D. Cal. 2005) ("Thus, the establishment of an IDEA violation is a necessary, but not sufficient, component of plaintiffs' § 504 claim."); *Brantley*, 936 F. Supp. at 656-57.

Unlike IDEA claims, the plaintiff alleging a § 504 claim "must prove  a *mens rea* of 'intentional discrimination'" or "deliberate indifference."  *Mark H.*, 513 F.3d at 938 (citations omitted); *Monahan*, 687 F.2d at 1170-71 (§ 504 does not create "general tort liability for educational malpractice" because "[e]xperts often disagree on what the special needs of a handicapped child are, and the educational placement of such children is often necessarily an arguable matter"); *Alex G.*, 387 F. Supp. 2d at 1124 (in special education context, the decisions must be "so inappropriate as to constitute either bad faith or gross misjudgment") (citations omitted).

Remedies include equitable relief and compensatory damages (but not punitive damages) for past actions of discrimination or exclusion.  *Mark H.*, 513 F.3d at 930 (citations omitted).

**C. ADA**

The ADA is substantially similar to the Rehabilitation Act, and thus courts analyze these claims together.  *Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 816 n.26 (9th Cir. 1999).  Cases interpreting the terms "reasonable accommodation" and "reasonable modification" are interchangeable.  *Id.*

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. § 12101(b)(1).  "Congress intended to prohibit outright discrimination, as well as those forms of discrimination which deny disabled persons public services disproportionately due to their

1   disability." *Crowder*, 81 F.3d at 1483.

2        To establish an ADA claim under Title II, "a plaintiff must show:  (1) that he is a

3   'qualified individual with a disability'; (2) he was either excluded from participation in or

4   denied the benefits of a public entity's services, programs, or activities, or was otherwise

5   discriminated against by the public entity; and (3) such exclusion, denial of benefits, or

6   discrimination was by reason of his disability." *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124,

7   1135 (9th Cir. 2001) (citation omitted); 42 U.S.C. § 12132.

8        "[T]he ADA imposes an obligation to investigate whether a requested

9   accommodation is reasonable." *Duvall*, 260 F.3d at 1136.  The plaintiff must prove that the

10  defendant's offer of accommodation was not reasonable. *Id.* at 1137.  Courts examine the

11  entire record to determine if the school fulfilled its duty to understand the particular

12  limitations of the student by gathering sufficient facts and consulting with experts to consider

13  available, effective accommodations. *Wong*, 192 F.3d at 818 (collecting cases).

14       The ADA, like the Rehabilitation Act, requires a plaintiff to establish intentional

15  discrimination or deliberate indifference on the part of the defendant. *Duvall*, 260 F.3d at

16  1138 & n.12 (citation omitted).  Similarly, "something more than mere violation of the IDEA

17  must be shown to demonstrate a violation of . . . the ADA in the context of the education of

18  handicapped children." *Brantley*, 936 F. Supp. at 657.

19       **D.  <u>Standard of Review</u>**

20       Summary judgment is appropriate when the "pleadings, depositions, answers to

21  interrogatories, and admissions on file, together with the affidavits, if any, show that there is

22  no genuine issue as to any material fact and that the moving party is entitled to judgment as a

23  matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

24  As the Brenneises bear the burden of proving every element of their claims, they must

25  identify specific evidence that demonstrates a genuine issue for trial.  All justifiable

26  inferences are drawn in their favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255

27  (1986).  Summary judgment is appropriate when the non-moving party fails to offer evidence

28  from which a reasonable jury could return a verdict in its favor. *Id*. at 252; *Matsushita Elec.*

1   *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); ("Where the record taken as a

2   whole could not lead a rational trier of fact to find for the nonmoving party, there is no

3   'genuine issue for trial.'").

4   **IV.    ANALYSIS OF MENS REA ELEMENT**

5          To establish a claim for damages under the Rehabilitation Act and ADA, a plaintiff

6   must prove the defendant intended to discriminate solely on the basis of the disability.  *Mark*

7   *H.*, 513 F.3d at 938.  Deliberate indifference suffices to establish intent.  *Duvall*, 260 F.3d at

8   1138-39.  Deliberate indifference is "knowledge that a harm to a federally protected right is

9   substantially likely, and a failure to act upon that likelihood."  *Id.* at 1139.  Negligence is not

10  sufficient.  *Id.* ("in some instances events may be attributable to bureaucratic slippage that

11  constitutes negligence rather than deliberate action or inaction").  The plaintiff is not required

12  to prove personal animosity or ill will.  *See id.*

13         A defendant's intent can be inferred from the totality of the circumstances.  *See Wong*,

14  192 F.3d at 818 (requiring a "fact-specific, individualized analysis"); *see generally Lindsey v.*

15  *SLT L.A., LLC*, 447 F.3d 1138, 1152-53 (9th Cir. 2006).  A handicapped student's case may

16  consist of evidence showing the school consciously ignored requests for aid or knowingly

17  refused to take any action to accommodate the disability.  *Davis v. Monroe Cnty. Bd. of*

18  *Educ.*, 526 U.S. 629, 650-51 (1999); *Vinson v. Thomas*, 288 F.3d 1145, 1154-55 (9th Cir.

19  2002) (summary judgment precluded when facts showed defendant failed to engage in good

20  faith, interactive process to discuss disabled person's needs and to explore appropriate

21  accommodations); *e.g.*, *S.L.-M. v. Dieringer Sch. Dist. No. 343*, 614 F. Supp. 2d 1152, 1163

22  (W.D. Wash. 2008) (denying school's summary judgment motion because facts showed

23  several instances when it "seems to have ignored requests for accommodation" which raised

24  an inference of deliberate indifference).  Conversely, a school can defend itself with evidence

25  that it responded to the student's request by investigating the facts, meeting with

26  decisionmakers, consulting with experts, maintaining a constructive dialogue with the

27  student, and taking other prompt, effective, and affirmative acts to attempt to provide

28  "meaningful access" to public education.  *Wiles*, 593 F. Supp. 2d at 1186-87; *cf.*

1    *Guckenberger v. Boston Univ.*, 8 F. Supp. 2d 82, 85, 87-91 (D. Mass. 1998) (in context of

2    litigation to modify an existing program, court examines whether school diligently and

3    sincerely assessed available options and whether its decision was "rationally justifiable").

4    Errors in professional judgment and a lack of success, however, do not establish deliberate

5    indifference in the special education context.  *Sellers*, 141 F.3d at 529; *Monahan*, 687 F.2d at

6    1170-71 (plaintiff must prove "something more" than an IDEA violation); *e.g., Brantley*, 936

7    F. Supp. at 656-57.

8         Courts apply the traditional shifting burdens of proof to claims for discrimination or

9    retaliation.  *E.g.*, *Alex G.*, 387 F. Supp. 2d at 1128; *Biggs v. Bd. of Educ. of Cecil Cnty., Md.*,

10   229 F. Supp. 2d 437, 444-45 (D. Md. 2002).  The plaintiff bears the initial burden to establish

11   a prima facie case.  The burden then shifts to the defendant to show a legitimate reason for its

12   action.  The plaintiff bears the final burden to establish the defendant's explanation is a

13   pretext.

14        **A.  Specialized Health Needs for G-Tube Feedings**

15             **1.  Accommodation**

16        The Brenneises argue the School District knew that T.B. needed G-Tube feedings to

17   be properly nourished while attending school, yet failed to ensure that T.B. could attend

18   school safely.  They contend that California law specifically details how a student's need for

19   G-Tube feedings is to be handled; however, the IEPs proposed for the 2006-2007 school year

20   did not identify a "qualified" individual.  The California statute states that the "qualified

21   designated school personnel [must be] trained in the administration of specialized physical

22   health care if they perform those [specialized health care] services [including gastric tube

23   feeding] under the supervision . . . of a credentialed school nurse."  Cal. Educ. Code §

24   49423.5 (2012).  The governing regulation defines a "qualified" person as being one "trained

25   in the procedures to a level of competence and safety which meets the objectives of the

26   training as provided by the school nurse."  Cal. Code Regs. tit. 5, § 3051.12(b)(1)(F) (2012).

27   They note that the School District knew these rules because it had been sued in the past by

28   other students with G-Tubes.  The Brenneises allege that the School District's failures to act

were not due to inadvertence or negligence, but were done with deliberate indifference.

The Brenneises rely heavily on the analysis in the OAH Decision, as if the ALJ's finding that the School District violated the IDEA by failing to comply with the California statute and its companion regulation automatically establishes an intent to discriminate against T.B.'s handicap.  But it is well-settled that the denial of a FAPE under IDEA does not alone establish a violation of the ADA or Rehabilitation Act.  *Mark H.*, 513 F.3d at 933; *Sellers*, 141 F.3d at 529; *Monahan*, 687 F.2d at 1170; *Alex G.*, 387 F. Supp. 2d at 1124; *Brantley*, 936 F. Supp. at 656-57; *see Lane v. Dep't of Interior*, 523 F.3d 1128, 1140 (9th Cir. 2008) (unsupported allegations and attorney argument "are insufficient to defeat a summary judgment motion").  While the School District ultimately lost the merits of its arguments under the IDEA about who would supervise T.B.'s G-Tube feedings, the evidence produced by the School District overwhelming refutes any inference that it intended to discriminate against T.B. or to exclude him from being educated with his peers in public school in violation of the ADA or Rehabilitation Act.[5]  *A.M. v. NY Dep't of Educ.*, ___ F. Supp. 2d ___, 2012 WL 120052, at *17 (E.D.N.Y. Jan. 17, 2012) (even if student was denied services he was entitled to by law, no reasonable finder of fact would be able to conclude the alleged discrimination was the product of deliberate indifference); *Brantley*, 936 F. Supp. at 656-57 ("any inappropriate decisions, . . . were, at most, errors in professional judgment").

First, the School District never ignored the Brenneises' concerns.  It was, at all times,

_____

[5] The School District maintains that T.B.'s behavioral aide could have been trained and supervised by a school nurse to assist T.B. with his G-Tube feedings.  T.B. was able to mix and pour the formula into his feeding tube in 2003, thus, the School District contends he would have been able to perform that part of the task in 2006-2007.  In fact, when T.B. visited Wangenheim in November 2007, he demonstrated the feeding procedure to the nurse, and independently completed it in five to ten minutes with minimal prompting.  [Bonnet Decl. ¶ 5.]

The School District also observes that any adult, after appropriate training by a nurse, could safely and competently supervise the procedure.  [*E.g.*, DSMF 4-5, 16, 21, 31, 39, 81, 87, 95-97, 100-01, 104; Vergara Decl. ¶¶ 10, 15; Gorman Decl. ¶ 3; Gorman Supp. Decl. ¶¶ 4-6; Howarth Decl. ¶¶ 4, 10, 20-22.]  For example, T.B.'s mother and Nicole Lukes, a behavioral aide, had been doing this when T.B. was at home.  [*E.g.*, DSMF 7-8, 21, 134 (a special education health technician and a personal helper were among adults who assisted T.B. in 1999 to 2003); Gorman Supp. Decl. ¶ 3.]  The School District proposed that a nurse would train T.B.'s behavioral aide (and other staff members) to assist with G-Tube feedings.  Unlike the school nurse, who would be responsible to the entire student body, the behavioral aide's sole duty was to assist T.B. through the entire day.  [*See* DSMF 43, 103.]

engaged in meaningful, substantive discussions about providing properly-trained adult supervision during T.B.'s G-Tube feedings at school. [*E.g.*, DSMF 115-27.] The record here is easily distinguishable from the facts of the *Duvall* case where the defendants failed to respond to the plaintiff's requests for accommodation. *Duvall*, 260 F.3d at 1130-32 (noting defendants had not "made any effort" and "took no action"), 1140 (defendants "failed despite repeated requests to take the necessary action" and denied requests "without making any effort to determine whether it would have been possible to provide the requested accommodation"). At every turn, the School District diligently responded in good faith to Mrs. Brenneises' ongoing concerns and vacillating requests. [PSMF Opp. 34, 38-40, 55, 77-78, 80; PSMF Reply 106, 144, 154; Brenneise Decl. ¶ 6; *e.g.*, DSMF 115-27.]

The record also demonstrates that the School District never refused to offer a qualified, competent, trained person to assist T.B.'s feeding procedure – it simply offered an approach to meet T.B.'s needs in a manner that differed slightly from the Brenneises' interpretation of the statute. [*See* PSMF Reply 161-62 (Pls.' Obj. to SDUSD's SMF)]; *see Wiles*, 593 F. Supp. 2d at 1183-85 (upholding jury verdict when school provided effective teachers "even if they lacked certain qualifications required" by IEP and administrative decision; some teachers were more competent than others, but all were responsive to student's needs; school provided staff training "albeit with tempered success") & 1186-87 (school presented persuasive evidence it did not intentionally discriminate by making good-faith attempts to provide meaningful access over five years, including IEP meetings with 25 staff members and a lot of discussion as well as expending over $200,000 on services every year); *Chambers v. Sch. Dist. of Philadelphia Bd. of Educ.*, ___ F. Supp. 2d ___, 2011 WL 5041363, at *13-17 (E.D. Pa. Oct. 24, 2011) (no genuine issue of material fact raised from record on school's intent even when it "failed at varying times" to provide services promised).

Second, the School District offered accommodations based upon its knowledge of T.B.'s abilities, which allowed any trained adult to assist him with the procedure. *Duvall*, 260 F.3d at 1139 (once plaintiff requests an accommodation, defendant must gather

information); *see supra* footnote 5.  The School District's decision was based upon the opinions of several qualified staff members, including many department supervisors, who managed T.B.'s case.  [*E.g.*, DSMF 74, 98, 114, 115 (Doctors' only assignment was T.B.'s case).]  The parents disagreed with the opinion, but they have no proof that the School District acted with deliberate indifference to T.B.'s health and safety needs.  [OAH Dec. FF ¶ 259, n.28.]

Upon gathering accurate, comprehensive facts about T.B.'s special needs and the opinions of educators, the School District also obtained expert guidance from medical professionals.  [*E.g.*, DSMF 145]; *A.M., supra* at *17 (denying summary judgment when school officials constantly, appropriately, diligently, and conscientiously responded to parents' requests after consulting with nurses and doctors).  In addition to the input from several nurses, the School District also relied on expert guidance from the Chief Medical Consultant, Dr. Taras, who stated that many students are able to safely accommodate G-Tube feedings with the assistance of a competent and trained aide.  [Taras Decl. ¶¶ 3-4.]

Notably, the parents did not request that a *nurse* personally administer the G-Tube feedings on a daily basis, and the ALJ confirmed that T.B. did *not* need to be supervised by a registered nurse.  [DSMF 87-88.]  While the School District's proposal fell short of providing a FAPE as required by the IDEA, the Court rejects the Brenneises' sweeping accusation that the School District was deliberately indifferent to T.B.'s need for qualified supervision during the procedure.

Nor did the School District single T.B. out for disparate treatment on account of his disability.  [DSMF 72 (95 of the 100 students in San Diego Unified with G-Tubes were assisted by non-nurses), 82 (T.B. received an average amount of time for nursing services), 97 (BSAs had been designated to assist other students with their G-Tube feedings); Gorman Decl. ¶ 3 (of 100 students, "the vast majority of g-tube feedings in the school setting are administered by designated unlicensed staff, and only rarely by nurses"); Bartz Decl, Ex. B at 10 (expert's opinion that the November 2007 IEP offered nursing services that "significantly exceeds the standard of health care at most public school sites in California.").]

1       At best, the evidence suggests that the School District was negligent in its

2   interpretation of the legal requirements as applied to T.B.  *Monahan*, 687 F.2d at 1170-71;

3   *Alex G.*, 387 F. Supp. 2d at 1124-27; *see Ferguson v. Phoenix*, 157 F.3d 668, 675 (9th Cir.

4   1998) (granting defendant's summary judgment).  Whether the plaintiffs failed to show a

5   prima facie case or the defendant showed it had legitimate, non-discriminatory reasons for its

6   actions, the Court finds the School District is entitled to summary judgment on this

7   Rehabilitation Act and ADA cause of action.

8                    **2.  Implementation**

9       On the related claim, the Brenneises allege that after the ALJ held in their favor

10  concerning a person qualified to deliver specialized health care services, the School District

11  did not comply with the OAH Decision to have a school nurse personally assist T.B.  [OAH

12  Dec. at p. 74, ¶ 1.]  Instead, the revised IEPs continued to allow the BSA to supervise T.B.'s

13  feedings even though the nurse would train the BSA for only three hours at the start of the

14  year.  They argue this intransigent failure to implement the OAH Decision constitutes

15  "stunning" deliberate indifference to T.B.'s disability and safety.

16      The School District defends its action on the ground that the November 2007 IEP

17  covered a different school year (2007-2008) than the one adjudicated (2006-2007).  The

18  OAH Decision expressly authorized the School District to designate the BSA in a *future* IEP,

19  provided she had adequate training from the nurse to competently assist T.B. with the G-

20  Tube feeding procedure.  [OAH Dec. LC ¶ 62.]  The 2007-2008 IEP was a "future" year in

21  relation to the OAH Decision's on T.B.'s 2006-2007 school year; therefore, the same level of

22  services were not necessarily required.  *See M.C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 66-

23  67 (2d Cir. 2000).

24      The Court concludes that no reasonable factfinder could determine from the evidence

25  presented that the School District failed to implement the OAH Decision on T.B.'s G-Tube

26  feedings at school with deliberate indifference to his disability.  *Brantley*, 936 F. Supp. at

27  656-57 (granting summary judgment on claim that school failed to implement an IEP on the

28  basis of the child's disability).  Granted, the School District's argument relies on a

1   technicality and its explanation is "not necessarily ironclad." *Wynne v. Tufts Univ. Sch. of*

2   *Med.*, 976 F.2d 791, 795 (1st Cir. 1992). Nonetheless, in the totality of the circumstances,

3   the School District's plausible response was certainly not discriminatory; instead, it was an

4   opinion based upon its knowledge of T.B.'s abilities and the basic skills an adult needed to

5   supervise the procedure through the new school year. *See supra* footnote 5.

6        In deciding the services to offer T.B. at Wangenheim, the School District also relied

7   on the ALJ's express proviso that "nothing in this Decision is intended to limit the

8   classification of employee that may be designated" under state law. [OAH Dec. LC ¶ 62]

9   The School District exercised professional judgment to implement the entire OAH Decision,

10  both in letter and in spirit, by specifying the initial feedings in 2007 would take place in the

11  nurse's personal presence, but optimistically anticipating that T.B. would soon be safe with

12  the behavioral aide's direct supervision because the nurse would continue to ensure the BSA

13  was competent. [*E.g.*, Vergara Decl. ¶¶ 6-11; Vergara Supp. Decl. ¶¶ 4-5; Gorman Supp.

14  Decl. ¶¶ 4-6; Howarth Decl. ¶¶ 4-6, 8-18 & Ex. A; Glynn Decl. ¶ 24; *see* OAH Dec. FF 58-

15  61, 209-15, & LC 7, 29, 59, 61-62 (upholding other parts of School District's plans); *see*

16  *supra* note 2 (referring to other efforts to accommodate T.B.'s disability).] A school does not

17  violate the ADA or the Rehabilitation Act when it has a rational explanation for its decision

18  to accommodate a student's disability even if its proposal fails to comply in every respect

19  with the request. *Sellers*, 141 F.3d at 529; *Monahan*, 687 F.2d at 1170-71 (a school's

20  "substantively faulty" plan does not amount to discrimination "[s]o long as the state officials

21  involved have exercised professional judgment, in such a way as not to depart grossly from

22  accepted standards among educational professionals"); *Wiles*, 593 F. Supp. 2d at 1183-87;

23  *Alex G.*, 387 F. Supp. 2d at 1124 (in special education context, only decisions that are "so

24  inappropriate as to constitute either bad faith or gross misjudgment" are actionable) (citations

25  omitted); *Brantley*, 936 F. Supp. at 656-57; *see Wynne*, 976 F.2d at 795 (school's diligent

26  assessment and rational justification satisfies its duty to accommodate a disability).

27        The School District changed the language in the IEP as required by the OAH

28  Decision; however, the Brenneises now blame the School District for not increasing the

1    number of hours for nursing services. [DSMF 142, 144.] The School District proposed that

2    the nurse would train the BSA in three hours in 2007, even though the ALJ had found no

3    evidence that three hours was sufficient to qualify the aide in 2006.

4         Importantly, however, the OAH Decision did not expressly require a change in the

5    number of nurse hours. And the School District did increase its offer to twelve hours from

6    eight. [*Compare* Glynn Decl., Ex. NN at 1a *with* Glynn Decl., Ex. OO at 1a.] These hours

7    included the time the nurse would directly supervise the behavioral aide to assist T.B. at the

8    start of the school year, and provided additional time for the nurse to monitor the aide's

9    competence and for the aide to consult the school nurse through the rest of the school year.

10   [Wyner Decl., Ex. 4.; Glynn Decl., Ex. OO at 2a.] The Court finds that the School District

11   reasonably interpreted the OAH Decision to require the nurse to be present and personally

12   supervise enough feedings to ensure that the BSA was adequately trained to take over that

13   task for the rest of the year.[6]

14         In an effort to persuade the Court that they have raised a question of fact, the

15   Brenneises point to the School District's request for a Due Process hearing on the November

16   2007 IEP in February 2008.

17         This argument lacks merit. The School District had the right to seek administrative

18   review of the new IEP for the 2007-2008 school year. *Alex G.*, 387 F. Supp. 2d at 1127

19   (decision, on advice of counsel, to seek judicial relief, is not an act of discrimination). The

20   IDEA's administrative review process is designed to resolve disputes promptly so that the

21   student may be immediately enrolled in school and obtain an educational benefit. *See Dell v.*

22   *Bd. of Educ.*, 32 F.3d 1053, 1060 (7th Cir. 1994). The School District did not act in bad faith

23   by pursuing administrative remedies on a different school year.

24

25         [6] The Brenneises' argument appears to be based on an assumption that the ALJ required the nurse to personally "provide" every feeding from the beginning to the end of the school year.

26   Pls.' Opp. Br. at 12, 16-17. Each procedure took approximately twenty minutes; T.B. needed two feedings during a full day at school; and school was in session approximately 184 days a

27   year. By that calculation, T.B. would have required over 120 nurse hours a year. The Court does not read the OAH Decision as requiring such a drastic increase for one student. The School

28   District's interpretation is reasonable. The nurse's services would be required for eight to twelve hours during the school year. This time would allow the nurse to train another adult to take over supervision of the feedings.

1    The Brenneises also rely on Mrs. Brenneise's declaration that she "was convinced that
2    SDUSD would not comply with the OAH Decision."  [Brenneise Decl. ¶ 12.]  She bases this
3    conclusion on Glynn's February 22, 2008 letter which stated the District was ready to start
4    T.B. placement at Wangenheim "immediately if you would consent."  [Glynn Decl., Ex.
5    KK.]  Mrs. Brenneise interprets it as a "demand" that she consent to the proposed December
6    2007 IEP that permitted the BSA to provide G-Tube feedings.  [Brenneise Decl. ¶ 12.]
7    Counsel argues that the term "consent" is a term of art in special education cases.  Pls.' Opp.
8    Br. 18-19.

9        No reasonable juror could agree with the proposed interpretation of Glynn's
10   encouragement given the staggering depth and breadth of time and energy expended by over
11   a dozen dedicated staff members and experts to ease T.B.'s safe transition into campus life at
12   Wangenheim.  *Matsushita*, 475 U.S. at 587; *Lane*, 523 F.3d at 1140 (attorney argument is not
13   evidence); *Chambers*, *supra*, at *16 (parents' opinions "unaided as they are by any other
14   evidence" did not prove deliberate indifference); [*e.g.*, Doctors Decl. ¶¶ 9 (four staff training
15   sessions), 10 (behavioral training session), 17 (arranging meeting between school nurse and
16   Mrs. Brenneise), 19-20 (collaboration team meeting), 25-28 (assuring Mrs. Brenneise that
17   full-time nurse was available), 30-32 (scheduling home visits with various providers), 44-49,
18   55-58 (three-hour meeting on Feb. 29, 2008, despite fact that Mrs. Brenneise had already
19   decided to move to Minnesota) & Exs. B (starting transition plan before receiving OAH
20   Decision), C & F (dozens of staff attended PKU training at Wangenheim), K & M (schedule
21   for phase one includes G-Tube feeding in nurse's office), R (meeting agenda), S, T & KK
22   (charts with scheduled transition plan activities); DSMF 115 (Sheila Doctor's only
23   assignment was to manage T.B.'s case), 192 (listing activities that occurred during transition
24   period).]

25       Finally, the Brenneises point to potential gaps in supervision in November 2007 when
26   the nurse at Wangenheim took medical leave while the "itinerant" nurse for the entire district
27   was on vacation.  [DSMF 151.]

28       These ordinary scheduling problems were adequately addressed by the School

1  District.  It had an another nurse available to fulfill the duties set forth in the proposed IEP.

2  [Vergara Decl. ¶¶ 2-5 ("When Sara Bonnet had to go out on medical leave, another nurse

3  was assigned to Wangenheim" full time); Doctors Decl. ¶¶ 25-28 (substitute nurse was

4  assigned and trained at Wangenheim) & Ex. BB; DSMF 148; Gorman Decl. ¶ 7.]

5       Having reviewed the record, the Court concludes that the School District is entitled to

6  summary judgment on the G-Tube feeding issue in the fifth claim.  *Anderson*, 477 U.S. at

7  247-48 ("[T]he mere existence of *some* alleged factual dispute between the parties will not

8  defeat an otherwise properly supported motion for summary judgment; the requirement is

9  that there be no *genuine* issue of *material* fact.").

10       **B.  Occupational Therapy Services**

11       Similarly, no evidence supports the Brenneises' conclusory allegation that the School

12  District intended to discriminate against T.B. or exclude him from public school by depriving

13  him of occupational therapy ("OT") services from School Options.

14       The administrative hearings were held from May to July 2007.  During those months,

15  School Options, a private company, had been providing T.B. with OT services pursuant to

16  the mutually-agreed upon stay-put placement to keep T.B. at home.  [DSMF 15.]  The School

17  District paid for School Options' services pursuant to a written contract that ended June 30,

18  2007.  [Glynn Decl. ¶ 26.]  A few months later, on October 5, 2007, OAH issued its written

19  decision.  As described above, in November 2007, the ALJ held that the School District

20  should continue to fund School Options despite the lack of certification.

21       During the intervening months, however, in August 2007, Chris Vinceneux, the owner

22  and occupational therapist, notified the Brenneises that he had not been paid for his services

23  in May, June, and July.  [DSMF 163-65.]  Because he had not received timely payment,

24  Vinceneux stopped providing T.B. with services in August 2007.  [PUMF 26; DSMF 167-

25  69.]  The Brenneises conclude that the School District intentionally caused this situation.

26  [*See* PUMF 28.]

27       The Brenneises' theory is wholly unsupported by the record.  The School District

28  fully and adequately explained the financial, contractual, and legal problems with School

1    Options.  [*E.g.*, DSMF 165, 172, 174, 176.]  One barrier was that School Options submitted

2    invoices that exceeded the amount the Board of Education had authorized the School District

3    to spend under the 2006-2007 contract; thus, the School District had to get permission to pay

4    the invoices at the September Board meeting.  [DSMF 166-69, 174; Wyner Decl., Ex. 24

5    (Board authorized payment for School Options from May to July 2007).][7]  When T.B.'s case

6    manager learned about the delayed payments, she invited Vinceneux to send copies of his

7    invoices for her to "track" to ensure he was paid within thirty days.  [Levine Supp. Decl., Ex.

8    YY.]  In addition, the School District promptly found a substitute OT provider who

9    immediately began working with T.B. after Vinceneux quit.  [DSMF 177-78; *see id.* 180

10   (when the second provider quit, School District's OT was available to T.B.).]

11        A second barrier arose when Vinceneux, who charged higher fees than other non-

12   public providers, refused to sign the standard contract to renew his services.  [DSMF 171;

13   Glynn Decl. ¶¶ 26, 32-36.]  The School District ultimately resolved the contractual problems

14   with School Options in January 2008 when it agreed to pay the higher rate and Vinceneux

15   returned.  [DSMF 184.]

16        A third problem was that School Options was not certified under California law.

17   [DSMF 161.]  As an equitable remedy, this Court upheld the OAH decision to make an

18   exception, but the School District was well within its rights to rely on California statutes

19   requiring special education service providers to have proper credentials.  Cal. Ed. Code §§

20   56366.1, 56505.2; [*see* DSMF 133 (District retained discretion in stay-put placement to

21   substitute other qualified providers).]  Indeed, the Brenneises had previously complained that

22   a special education teacher was not certified in California and obtained an award of

23   compensatory education to remedy the violation.  [*See* SAC ¶ 30; *accord* Doc. No. 119-1

24   (requesting compensatory education on similar theory).]

25        The Brenneises complain about various delays; however, each delay was explained.

26   _____

27        [7] The Brenneises rely on Vinceneux's deposition testimony that he wasn't paid until
     December.  The School District correctly shows that he was confused, as the payment in
28   December was for a different amount.  *Compare* Wyner Decl. Ex. 24 (Board authorized
     $3,737.50 in September) *with id.* Ex. 25 (Vinceneux refers to check for $2,223 in December).

[PUMF 29; *e.g.*, Doctors Decl. ¶¶ 35, 51-52 & Exs. CC, FF.]  Throughout the scheduling difficulties and bureaucratic struggle, the School District kept in constant communication with the Brenneises.  [*E.g.*, Doctors Decl. ¶ 42 & Exs. GG, HH, II; Glynn Decl. ¶¶ 38-43 & Exs. V, X, AA, CC; Howarth Decl. ¶¶ 8, 16-17  & Ex. A; *see* DSMF 115-27.]  The School District further offered to fund any make-up sessions with School Options, but the Brenneises did not respond to the offer.  [Glynn Decl. ¶ 22 & Ex. II.]

Finally, once T.B. began attending Wangenheim full time, the staff therapist would be providing his OT services.  The School District took steps above and beyond its obligations to ensure its therapist met with School Options to ease T.B.'s transition between providers.  [DSMF 181, 221, 225-26; Gahan Decl. ¶¶ 8, 10-12 & Ex. D; Doctors Decl. ¶¶ 52-54 (plan contemplated one collaboration meeting, but District held two); Howarth Decl. ¶¶ 4-6, 9, 11-18.]

In sum, the School District consistently and promptly responded to the changing circumstances in trying to implement the OAH Decision regarding T.B.'s OT needs.  *Ferguson*, 157 F.3d at 675 (granting defendant's summary judgment when "the situation clearly appears to be no more than at times some not uncommon bureaucratic inertia"); *Chambers*, *supra*, at *16-17 (when school district made bona fide effort to implement the plan in face of great logistical hardship, it did not act with deliberate indifference to student's educational needs); *cf. Duvall*, 260 F.3d at 1130-32, 1140 (denying summary judgment when record revealed defendants made no effort and took no action to respond to plaintiff's disability).  The School District was prepared at all times to provide T.B. with OT services to address his disability.  [DSMF 133, 158, 172, 177-87.]  The parents' demand for a specific individual to provide those services does not establish either an ADA claim or a violation of § 504.  *Matsushita*, 475 U.S. at 587; *see Di Lella v. Univ. of the D.C. David A. Clarke Sch. of Law*, 570 F. Supp. 2d 1, 8 (D. D.C. 2008) (school can offer any reasonable, effective accommodation as alternate to student's specific demand) (*citing Hankins v. Gap, Inc.*, 84 F.3d 797, 800 (6th Cir. 1996)).

///

C. **Retaliation**

The Brenneises ask the Court to infer retaliation from the above facts.  [*See* DSMF 249, 251.]  The Court finds no evidentiary basis for this claim.  The School District presented an overwhelming body of evidence that they took good faith steps in a legitimate effort to accommodate T.B.'s special needs in a public school setting.  *Derrick F. v. Red Lion Area Sch. Dist.*, 586 F. Supp. 2d 282, 302-08 (M.D. Penn. 2008) (granting summary judgment on retaliation claim because school made good faith effort to implement the IEP; answered parents' request to make exception to general rule; enforced same field trip rule for all parents, and "sincerely and reasonably" disagreed about what the IEP required); *Alex G.*, 387 F. Supp. 2d at 1129 (parents failed to present specific and substantial evidence to support retaliation claim).  Each member of the IEP Team was motivated by a desire to return T.B. to public school with his peers.  [*E.g.*, DSMF 115-16, 126, 176-81.]  In the course of meeting their legal obligations to T.B., the IEP Team members took great pains to respond to Mrs. Brenneises' extensive concerns and demands.  No reasonable jury would conclude from this record that the School District acted to retaliate against the Brenneises' assertion of T.B.'s right to an education.  *Matsushita*, 475 U.S. at 587; *Alex G.*, 387 F. Supp. 2d at 1128-29; *Lane*, 523 F.3d at 1140 (unsupported allegations and attorney argument "are insufficient to defeat a summary judgment motion" that defendant acted with intent to retaliate).

V. **Costs**

This order resolves the final remaining claims of this lengthy litigation.  Costs "should be allowed to the prevailing party."  Fed. R. Civ. P. 54(d)(1).  Each side has prevailed on a significant issue in this litigation.  The Brenneises prevailed on the IDEA claims (to the extent they were litigated) and the Court awarded attorney's fees.  [Doc. No. 237]  Conversely, the School District prevailed on the ADA and Rehabilitation Act claims and avoided any award of money damages.  Accordingly, the Court exercises its discretion to deny costs to either party.  *Ass'n of Mexican-American Educators v. Cal.*, 231 F.3d 572, 591 (9th Cir. 2000) (district court must explain exercise of discretion to deny costs).  Each party shall bear their own costs "since each of them prevailed, at least in part, in this court." *All*

1   *West Pet Supply Co. v. Hill's Pet Prods. Div.*, 153 F.R.D. 667, 669-70 (D. Kan. 1994)

2   (collecting cases).

3                                   CONCLUSION

4          Based on the foregoing reasons, the Court **GRANTS** the San Diego Unified School

5   District's Motion for Summary Judgment on the fourth, fifth, and seventh causes of action, [#

6   209]; and **DENIES** the Brenneises' motion for partial summary judgment on their fourth

7   claim for relief in the Second Amended Complaint.  [# 208].  This Order resolves all

8   remaining claims.  The Clerk of Court is instructed to enter judgment in accordance

9   herewith.[8]  Each party shall bear its own costs.

10         **IT IS SO ORDERED**.

11  DATED:  May 8, 2012

12                                            _Michael M. Anello_

13                                            Hon. Michael M. Anello
                                              United States District Judge

14

15

16

17

18

19

20

21

22

23   _____

24         [8] As to the SAC, the Brenneises defeated the School District's motion for summary
     judgment seeking judicial review of the OAH Decision on three IDEA issues.  [Doc. Nos. 118,
25   142, 153, 154.]  They prevailed on their second claim and shall recover the attorney's fees set
     forth in the March 21, 2012 Order.  [Doc. No. 237]  The parties stipulated to a Rule 68 entry of
26   judgment in favor of the Brenneises on the third claim.  [Doc. No. 151, 153, 154.]  The civil
     rights claims were combined in the fourth, fifth, sixth, and seventh causes of action; although
27   the caption incorrectly identified it as the fifth and final claim. [SAC 1 & ¶ 33-62.]  The parties
     settled and voluntarily dismissed the sixth cause of action, which focused on the absence of a
28   qualified teacher in the home school program.  [Doc. No. 207 & 212]  The School District's
     separate complaint was subsumed into the pleadings in the consolidated action.