EXHIBIT "D"

115 LRP 39059

## LOS ANGELES UNIFIED SCHOOL DISTRICT

### California State Educational Agency

2015050091

### July 29, 2015

**Judge / Administrative Officer**

**Elsa H. Jones, Administrative Law Judge**

### Full Text

**Appearances:**

## DECISION

Student filed a due process hearing request with the Office of Administrative Hearings, State of California, on May 4, 2015, naming Los Angeles Unified School District.

Administrative Law Judge Elsa H. Jones heard this matter in Van Nuys, California, on June 16, 17, and 18, 2015.

Student's Father appeared on all days of hearing, representing himself and Student. Mother and Student were not present at hearing. Bernadette Buckley, a Spanish interpreter, was present on the first day of hearing to interpret for Mother. 1

Mary Kellogg and Christine N. Wood, Attorneys at Law, represented District. Francine Metcalf, Specialist, Compliance Support and Monitoring for District, was present on June 16. Matthew Adair, Specialist, Compliance Support and Monitoring for District, appeared on June 17 and June 18.

1 Since Mother was not present at the hearing at all, Ms. Buckley's services were not required. Another Spanish interpreter, Sonia Hernandez, was present at the beginning of the second day of hearing. At that time, the parties agreed that no party or witness required an interpreter, and therefore Ms. Hernandez was excused and no interpreter was present at any other time during the hearing.

2

Sworn testimony and documentary evidence were received at the hearing. A continuance was granted until June 29, 2015, for the parties to file written closing arguments. The parties filed their written closing arguments on June 29, 2015, at which time the record was closed and the matter was submitted for decision. 2

ISSUES 3

1. Did Student's October 25, 2013 individualized education program fail to offer

Student a free appropriate public education because District:

A. Predetermined Student's IEP goals?

B. Failed to complete assessments prior to the IEP meeting?

C. Failed to present assessment reports at the IEP meeting?

D. Failed to discuss compensatory language and speech services?

E. Failed to discuss compensatory occupational therapy services?

2. Did Student's January 22, 2014 IEP fail to offer Student a FAPE because

District:

A. Failed to offer Student a behavior support plan;

B. Failed to invite the behavior intervention development provider to the IEP meeting?

C. Failed to include the recommendations made by independent

educational evaluator Kerri Giddens regarding Student's individual transition plan?

2 Student's written closing argument did not include a proof of service. On July 2, 2015, Student filed his written closing argument with a proof of service, showing service on District on June 29, 2015. Student's written closing argument is deemed to have been timely filed.

3 For the sake of clarity, certain of the issues have been restated and reordered compared to how they appeared in the Prehearing Conference Order

dated June 11, 2015. The ALJ has authority to redefine a party's issues, so long as no substantive changes are made. (J. W.. v. Fresno Unified School Dist. (9th Cir. 2010) 626 F.3d 431, 442-443.)

3

3. Did District deny Student a FAPE with respect to related services by reason of

the following:

A. Failing to implement Student's regular and compensatory language and speech services using Student's last agreed upon goals in his April 2011 IEP, from October 25, 2013 until December 12, 2014?

B. Failing to implement Student's regular and compensatory occupational therapy services using Student's last agreed upon goals in his April 2011 IEP, from October 25, 2013 until December 12, 2014?

C. From the time of the October 25, 2013 IEP onward, changing Student's language and speech services from individual to group without Parent's knowledge or written consent?

4. Did District deny Student a FAPE by its method of documenting Student's

behavioral outburst on December 1, 2014?

5. Did District deny Student a FAPE by not providing Parents with a copy of the

November 7, 2014 IEP that they had signed on December 12, 2014, but rather with a copy of an IEP that changed the terms from the one that they had signed?

6. Did District deny Student a FAPE by failing to include Parents in the April 29,

2015 IEP meeting?

SUMMARY OF DECISION

This case arises from a previous due process hearing. In 2013, Student graduated from North Hollywood High School with a regular high school diploma. Parents prevailed against District at a due process hearing held in August 2013, which resulted

in a Decision dated September 26, 2013. As a result of the Decision, Student's regular high school diploma was invalidated. District was ordered to hold an IEP meeting within 30 days of the Decision to provide Student with a placement, and to provide specified amounts of compensatory individual speech and language and occupational therapy services. At this meeting, District was also to develop a FAPE offer for the 2013-2014 school year and special education summer school. Parents were to have the opportunity to meaningfully participate in this meeting. In addition, the September 2013 Decision ordered District to retain an educational consultant to provide an individual transition plan for Student, and hold an IEP

4

meeting following the development of the transition plan. 4 Pursuant to the September 2013 Decision, District convened an IEP meeting on October 25, 2013, in an attempt to implement the placement and compensatory services required by aspects of the Decision, and to offer Student a FAPE for the 2013-2014 school year and summer school.

This matter involves whether District deprived Student of a FAPE on several grounds, including by allegedly not using the appropriate goals in providing the compensatory speech and language and occupational therapy services ordered in the September 2013 Decision, by allegedly not considering and implementing the recommendations of the transition assessment, and by interfering with Parents' right to participate in the decision making process regarding Student's education.

Student did not meet his burden of proving that District deprived him of a FAPE with respect to any of the matters alleged in his Complaint.

FACTUAL FINDINGS

General Background and Jurisdictional Matters

1. Student is a 21-year-old who has resided with Parents in the District at all relevant times. Parents have been Student's conservators since June 14, 2012.

Copyright © 2016 LRP Publications

At all relevant times, Student has been eligible for special education as a student with autism. Since October 2013, he has attended a special day program for students with autism at Leichman Special Education Center, located in the District. Student's special day program serves students who are ages 18-22. Prior to attending Leichman, Student had attended North Hollywood High School, also in the District.

2. Student's language skills are delayed. He required behavioral support throughout the school day, and he engaged in physical and verbal aggression when frustrated. He was adept with computers, and he had an intense affinity for viewing pornographic anime websites anytime he had access to the internet.

Occupational Therapy and Speech Goals in the April 7, 2011 IEP

2. Student's last agreed upon IEP was dated April 7, 2011, which was developed when he was 17 years old and in 10th grade at North Hollywood. The April 7, 2011 IEP provided, among other things, goals in speech and language and occupational therapy. The speech and language goal addressed pragmatics, and stated that Student would maintain an

4 The prior Decision also ordered District to take other actions, but they are not relevant to this matter.

5

interaction on a preferred/non-preferred topic for four-plus turns utilizing question/answer, statement/statement responses while maintaining eye contact and attention with 70 percent accuracy in four out of five trials with minimal verbal prompts.

4. The occupational therapy goal addressed Student's sensory-processing skills. The goal provided that directly after completing sensory strategies, Student would be able to attend and complete other directed activity, such as writing and math, for at least 15 minutes with functional attention, appropriate self-regulation, and without excessive signs of distractibility and fidgeting with no more than two verbal cues with 80 percent accuracy in four out of

five opportunities.

September 26, 2013 Due Process Decision and Order

5. On May 6, 2013, Parents filed a due process complaint against District, which was assigned OAH Case Number 2013050272, and which resulted in a Corrected Decision dated September 26, 2013. The September 2013 Decision determined that District had unlawfully awarded Student a regular high school diploma from North Hollywood in June 2013, and exited him from special education. The Decision invalidated Student's high school diploma and contained an Order by which the District was to take a variety of measures, including: (1) hold an IEP meeting to offer Student a placement and a FAPE; (2) ensure Parents were provided the opportunity to meaningfully participate in this IEP meeting; (3) fund an independent consultant to develop an individualized transition plan for Student; (4) provide 78 hours of compensatory individual speech and language services to be completed by September 26, 2015; (5) provide 39 sessions of compensatory individual occupational therapy services, with each session to be 45 minutes in length, to be completed by September 26, 2015; and (6) assess Student in the area of assistive technology. Aside from the work of the independent transition consultant, the assistive technology assessment was the only assessment ordered in the September 2013 Decision. The Order provided that Parents and the District could modify any part of the Order by signing a mutually agreed-upon IEP. 5

October 25, 2013 IEP

6. District convened an IEP meeting on October 25, 2013, to comply with the September 2013 Decision. The IEP team included Parents, and all required participants, including Svetlana Guermacheva, a District occupational therapist who had previously provided occupational therapy services to Student when he attended North Hollywood. An

5 District appealed the September 2013 Decision

**SpecialEdConnection® Case Report**

to the federal district court, and the Decision was partially overturned. A copy of the district court decision was not provided. However, there was no argument or evidence that the portions of the Decision that are the subject of this matter were affected by the outcome of the appeal.

6

interpreter was present. The behavior intervention development provider from Total Education Solutions, a nonpublic agency, was invited to attend the meeting, but did not attend. 6 No assessments were performed prior to the meeting, and no written reports were prepared regarding Student's present levels of performance and goals for presentation at the meeting.

7. The team reported Student's progress on his goals. The team considered Student's present levels of performance in the areas of reading, written language, mathematics, vocational education, English language development, behavioral support, vocational education, adaptive behaviors, occupational therapy (visual motor/sensory processing), and behavior. The present levels of performance were based upon teacher reports and observations, as well as on Student's California high school exit exam scores in mathematics and English Language Arts, the California English Language Development tests, and informal assessments. The present levels of performance in occupational therapy were the same, in all material respects, as the present levels of performance in occupational therapy that were included in the April 2011 IEP, which was Student's last agreed-upon IEP. The present levels of performance in speech and language was not the same as those in the April 2011 IEP.

8. District presented draft goals at the IEP, and the IEP team, including Parents, reviewed the goals. Parents were able to ask questions about the goals and suggest revisions. They did not do so. Had they done so, District would have considered Parents' comments and suggestions.

9. The team developed goals in areas of need discussed in the present levels of performance, including speech and language and occupational therapy. The goals were based on the present levels of performance, and were developed thorough a variety of methods, including review of previous IEP's and previous goals, records review, and the knowledge of Student possessed by previous service providers and teachers. For example, the occupational therapy goal was drafted by Ms. Guermacheva, who testified at hearing. The goal was based in part on her prior knowledge of Student, and on the goal in his April 2011 IEP, as she had been his occupational therapist during the 2011-2012 school year. The goal addressed Student's sensory-processing skills. It provided that directly after completing sensory strategies, Student would be able to attend and complete other directed activity, such as writing and math, for at least 15 minutes with functional attention, appropriate self-regulation, and without excessive signs of distractibility and fidgeting with no more than two verbal cues with 80 percent accuracy for four out of five times. The occupational therapy goal in the April 7, 2011 IEP was nearly the same as the goal in the October 25, 2013 IEP, except that the goal in the October 25, 2013 IEP specified an accuracy

6  A behavioral intervention development provider supervises Student's behavior aide. The behavioral intervention development provider will be referred to as a behavior supervisor in this Decision.

7

target of 80 percent accuracy in four out of five opportunities, whereas no such specific accuracy target was included in the April 2011 IEP goal. Rather, that goal simply provided that Student would perform the required task in four out of five opportunities, without also requiring that Student would perform the task at 80 percent accuracy 80 percent of the time.

10. The speech and language goal was directed toward pragmatics, and provided that Student would be able to infer information when given a simple

Copyright © 2016 LRP Publications

scenario with at least 80 percent accuracy with cues as needed on four out of five attempts. The speech and language goal was different from the goal in the April 2011, IEP. That goal, which also addressed pragmatics, provided that Student would maintain an interaction on a preferred/non-preferred topic for four-plus turns utilizing question/answer, statement/statement responses while maintaining eye contact and attention with 70 percent accuracy in four out of five trials with minimal verbal prompts.

11. The team offered placement at Leichman, with an alternate curriculum, with home to school transportation and special education summer school. Student was to be in special education 100 percent of the school day. The team offered a full-time behavioral aide from a nonpublic agency during the school day, as well as nonpublic agency behavioral intervention development (behavioral supervision), during both the regular school year and special education summer school. The team also offered a District behavior aide to ride with Student on the bus. The nonpublic agency behavioral services were offered for 48 weeks per year. The team offered regular occupational therapy in the amount of 200 minutes a year, to be delivered up to 10 sessions per year. The team offered regular speech and language services for 120 minutes per month on a pull-out basis during the both the regular school year and special education summer school.

12. The IEP team specifically offered 39, 45-minute sessions of compensatory occupational therapy, to be delivered on an individual basis, as ordered in the September 2013 Decision. The team offered the 78 hours of compensatory speech and language services ordered in the September 2013 Decision, at a rate of two hours per week. Unlike in the September 2013 Decision, however, the IEP team did not specify that those services were to be provided on an individual basis. The evidence reflected that, if the IEP did not specify that speech and language services were to be given on an individual basis, then the team was leaving it to the discretion of the speech and language provider as to whether the services

would be provided individually or in a small group.

13. The team recommended assessments in the areas of occupational therapy, speech and language, psychoeducational, behavior, academics, and assistive technology/ augmentative alternate communication. District revised the assessment plan to address Parents' concern for a behavioral and augmentative alternate communication assessment. The IEP included a behavior support plan, to address Student's difficulty with peer interaction, and an individual transition plan.

14.

8

The meeting disappointed Parents. They had not expected goals to be discussed, and they thought it was improper to discuss goals because no assessments or assessment reports had been completed. They thought the purpose of the meeting was simply to discuss the compensatory services and the transition plan which were the subject of the September 2013 Decision. Additionally, Father objected to the presence of the speech therapist and the occupational therapist at the meeting. At hearing, Father recalled that he stopped the meeting from going forward because of his displeasure before the compensatory services in speech and language and occupational therapy were discussed. Other witnesses who testified did not recall Father stopping the meeting, but rather recalled that the meeting proceeded normally to its conclusion. There was no documentation in any part of the IEP that Father stopped the meeting.

Parents signed the IEP on October 25, 2013, noting on the IEP that they consented to the placement and to the offer of FAPE and compensatory time for both occupational therapy and language and speech. Parents specified that they did not agree with "anything else in regard to any goals written in the IEP." They agreed to the implementation of all services at the new school.

Parents had the opportunity to question and comment upon the IEP, but they did not do so, except

as noted above. District would have considered Parents' comments, had Parents expressed concerns.

As a consequence of this IEP team meeting, Student enrolled in Leichman on October 31, 2013.

Occupational Therapy and Speech and Language Services During the 2013-2014 School Year

Ms. Guermacheva provided Student two to four sessions of the compensatory occupational therapy in fall 2013, that had been ordered in the September 2013 Decision and included in the October 25, 2013 IEP. She received her bachelor's degree in sociology from the University of Southern California, and her master's in occupational therapy from the same institution. Ms. Guermacheva has a current occupational therapy license, and has been employed by District for seven years.

16. Starting in March 2014 and for the remainder of the 2013-2014 school year, Bryan Saavedra provided both compensatory and regular occupational therapy services to Student. Mr. Saavedra received a bachelor's degree in occupational therapy, and holds a current occupational therapy license. He has been employed by District as an occupational therapist for 11 years. Both the Student's regular and compensatory occupational therapy services provided during the 2013-2014 school year were provided on an individual basis, and the goal used for all of these occupational therapy services was the goal in the April 11, 2011 IEP.

20. Subsequent to the October 25, 2013, IEP, District also provided Student with regular and compensatory speech and language services. The goal in the October 25, 2013 IEP was used for both the regular and compensatory speech and language services until shortly after the January 22, 2014, IEP meeting, discussed below. Subsequent to the end of January 2014, all of Student's language and speech services were provided using the goal in the April 2011 IEP, until Parents agreed to new goals in the November 7, 2014 IEP, as is further discussed below.

21. The regular speech and language services

were provided by Sandra Silvers, a District speech and language therapist, from the time Student enrolled at Leichman at the end of October 2013 and throughout the 2013-2014 school year. Ms. Silvers was employed by the District for 38 years, and she testified at hearing. Ms. Silvers received a bachelor's degree in communicative disorders, and holds a lifetime communicative disorders credential. Student's compensatory speech and language services were provided by Leticia,' a speech and language pathologist assistant. Speech and language pathologist assistants are qualified to provide speech and language services. Leticia had been working for the District for about three years at the time she was providing services to Student. She provided Student's compensatory speech and language services from November 2013 (shortly after Student enrolled in Leichman), until in or about January 2014. Thereafter, another District speech and language pathologist, Susan Kahzdorf, provided Student's compensatory speech and language services for the remainder of the 2013-2014 school year.

22. During the 2013-2014 school year, Ms. Silvers provided Student's regular speech and language services in a small group setting with two to three other Students. During the 2013-2014 school year, the first 30 minutes of each of Student's one-hour compensatory speech and language sessions were provided on an individual basis, and the remaining 30 minutes of each session were provided in a small group setting.

Transition Assessment

21. As a result of the September 2013 Decision, Keri Giddens from Tierra del Sol, a private agency, conducted a transition assessment of Student. Ms. Giddens produced a report of the assessment dated October 30, 2013. The assessment was based upon interviews with Student and others who were familiar with him, observations, and a records review. The report addressed the areas of Education and Training, Job Training and Employment, and Independent Living Skills.

22. In the area of education and training, the

**SpecialEdConnection® Case Report**

assessor concluded that postsecondary education appeared to be a critical component of Student's ability to gain the vocational and independent living skills he needed to meet his future career goals. The

7 Leticia's last name was not given at hearing.

9

10

assessor determined that Student was an auditory learner, who required development of his ability to follow a task analysis and communicate wants and needs. In the education setting, the assessor recommended that Student be taught tasks by way of a detailed task analysis, which would fade into an "if, then" scenario. The report recommended that Student be taught to participate and attend to group instruction and to act on general announcements by use of social stories. Student should also be assessed for adaptive communication, since he did not appear to have the means to communicate his desires. In the community setting, the assessor recommended increasing Student's repertoire of preferred community activities, using social stories to support his activities in the community, and professional behavior intervention to teach Student replacement behaviors. The report noted that when Student was upset, frustrated, or not able to access something that he wanted, his behaviors would become aggressive. In the home setting, the report recommended Student have a schedule of chores, that the family implement emergency drills, and prompt Student to participate in family discussions.

25. In the area of job training and employment, the report noted that nobody could identify a specific career for Student, but that Student should continue on a path of career discovery. The report recommended that Student should focus on development of community safety skills, obtaining an understanding of the structure and flow of work, generalization of tasks across environments, task initiation and completion, and quality checking. More specifically, in the education setting, the report recommended that Student's time in community

activities be increased, and that his instruction focus on communication, handling emergencies, generalization of skills across environments, and self-initiation. In the community setting, Student should begin to participate in community activities that would remain in place for him after his exit from school. In the home setting, the report recommended a token system to help Student learn to remain on task and be productive.

26. The report noted that Student's independent living skills training should focus on safety, self-advocacy, communication, and development of social relationships. Specifically, in the education setting, Student should visit and participate in various jobs and community activities and determine what he liked and did not like about each activity. He should participate in safety training, and be taught to handle situations with which he struggled, such as noisy situations. His communication and socialization skills could improve by having Student participate in a discussion of current events each morning. A behavioral support provider should teach Student to use technology and how to self-regulate so that he did not access inappropriate websites. In community settings, Student should learn some key safety strategies and a behavioral support provider should teach Student appropriate coping mechanisms for use in stressful and frustrating situations. Student should find and join groups in the community that have similar interests to his. In the home setting, Student should be taught safety skills, engage in conversations with family members about their day, and focus on learning good manners.

11

January 22, 2014 IEP

27. Pursuant to the October 25, 2013 IEP, at which the IEP team recommended assessments, District presented an assessment plan to Parents. On November 13, 2013, District received Parents' consent to assess. Thereafter, and prior to January 22, 2014, District performed assessments in the areas of psychoeducational, assistive technology, speech and

Copyright © 2016 LRP Publications

language, including augmentative alternative communication, academics, behavior (a functional analysis assessment), and occupational therapy. District convened an IEP meeting on January 22, 2014, to review the assessments. All required members of the IEP team were present, and the team included Parents, a District administrator, a school psychologist, Ms. Giddens (the assessor from Tierra del Sol), a special education teacher, Michelle Bahy (Student's behavior supervision provider from Total Education Solutions), Ms. Silvers (Student's speech and language therapist), and other related service providers in the areas of occupational therapy, transition, and assistive technology. Student was invited to attend the meeting, but did not attend.

28. The team reviewed Student's progress on goals and reviewed present levels of performance in the areas of assistive technology/written expression, functional reading, functional mathematics, functional writing, English language development, communication, vocational, behavior, physical fitness, and speech and language. During these discussions, the psychoeducational, assistive technology, academic, speech and language, occupational therapy, transition, and functional analysis assessments were reviewed. Ms. Giddens presented her transition assessment report and the IEP team considered it and discussed how to incorporate the report's recommendations into the IEP. 8

29. District set goals in all areas of need described in the present levels of performance. The speech and language goal did not change from that in the October 2013, IEP. Student had made partial progress on that goal. District revised the occupational therapy goal. It provided that, to demonstrate improved sensory processing/upper extremity strength, Student would demonstrate three sensorimotor exercises in a minimum of three out of five trials, with a maximum of two verbal prompts with 75 percent accuracy.

30. District determined that Student should continue to be placed in the special education program at Leichman for 100 percent of his school

day, on the alternate curriculum. The IEP offered home to school transportation and summer school, and a District behavior aide on the bus. The IEP offered a nonpublic agency behavioral aide on a full-time basis during the school year and summer school as well as accompanying behavior supervision services; speech and language services in a small group or on an individual basis for 30 minutes per week during the regular school year and 20 minutes per week during summer school; occupational therapy services during the regular school year for 30 minutes

8 Neither Ms. Giddens nor any other representative from Tierra del Sol testified at hearing.

12

per week until October 31, 2014, and thereafter for 45 minutes per month. The IEP stated that Student had completed 11 hours of the 78 hours of compensatory speech and language services, and 4 of the 39 sessions of compensatory occupational therapy services ordered in the September 2013 Decision. The IEP offered 120 minutes per week of direct compensatory speech and language services, and 35 sessions of individual compensatory occupational therapy services at the rate of 45 minutes per session, based upon the September 2013 Decision. The IEP did not specify that the language and speech services would be provided on an individual basis.

31. The team reviewed the behavior support plan included in the IEP. The behavior support plan addressed Student's outbursts, rage, and explosive reactions. The IEP also included an individual transition plan. Certain aspects of Tierra del Sol's report overlapped the individual transition plan and the vocational skills Student was working on at school. For example, Lisa Pchakjian, Student's classroom teacher during the time he enrolled at Leichman through summer school 2014, worked on a variety of vocational and workplace skills that overlapped the Tierra del Sol report. She focused on task structuring, asking for help and breaks in the workplace, using manners and social skills in the workplace, and remaining on task for 15 to 20

**SpecialEdConnection® Case Report**

minutes at a time.

32. The IEP transition plan included as a postsecondary goal that Student enroll in and attend a vocational program, and that he learn to transition between tasks independently or with identified supports to support the goal. This goal incorporated the Tierra del Sol recommendation that Student learn task analysis, as staff worked with him on performing specific timed tasks and transitioning between tasks, including following instructions and learning the steps necessary for each task. With respect to employment, the IEP transition plan described Student's results on the picture interest career survey, noting that Student was artistic and interested in design, applied arts, architecture, culinary arts, performing arts, fine arts, media, and fashion. As a postsecondary goal, Student would participate in a work/ activity program. District recommended that Student participate in a structured vocational training experience to explore interests and to develop work-related skills/abilities, such as on-task behavior, and completion of a sequence of tasks. Upon completion of high school, Student would live with family/relatives, and, to support that goal, Student's independent living activity would include performing light household maintenance/chores. The IEP transition plan recommended that Student participate in some community trips with other classrooms, participate in vocational electives that provide specific job training skills and independent living skills, and participate in school performing arts as a leisure activity.

33. Leichman staff incorporated the recommendations of the Tierra del Sol report in developing Student's transition activities. For example, the Tierra del Sol report recommended helping Student with social situations and behaviors, and therefore Student was placed in a behavior classroom to work on social situations. The Tierra del Sol report recommended that Student go into the community and learn about different businesses, but staff was unable to do this with Student due to his intense desire to locate internet

13

connections so that he could engage in inappropriate internet activity. Therefore, staff would invite members of the community to campus. Staff also worked with Student on job interviewing skills. Staff also incorporated the recommendation Student do chores such as cleaning and organizing, as Student worked on those skills at school.

34. Also in support of Student's future plans, the IEP addressed his present level of performance in the vocational area, and set a vocational goal. The team noted that Student was ready, and needed to be able, to work independently on vocational tasks, and that he would attend the Practical Assessment Exploration System laboratory on campus, which was a simulated workplace laboratory where Student would select tasks and complete them. Student's vocational goal provided that Student would attend this laboratory on a regular basis and complete 80 jobs independently with 70 percent accuracy.

35. Other aspects of the IEP also addressed Student's vocational and independent living skills, and incorporated aspects of the Tierra del Sol report. Student's communications goal provided that Student would use appropriate phrases such as "please," "thank you," and "excuse me," when speaking to adults. Student's functional mathematics goal addressed his need to learn the value of coins and bills. His functional writing goal addressed keyboarding skills. However, the team noted that any computer Student used must be disconnected from the internet, because otherwise he would immediately attempt to access inappropriate websites. Not only did the attraction of internet-connected devices cause Student anxiety and affect his ability to focus on assignments, but he also had a tendency to engage in aggressive behavior when staff attempted to prevent him from accessing the internet. The team developed two behavior goals to address this and similar behaviors. One such goal provided that when Student was presented with an activity or task that created frustration, he would not exhibit signs of aggression to himself or others with 90 percent accuracy in four

Copyright © 2016 LRP Publications

out of five trials. The other goal provided Student would use appropriate forms of communication, such as ask for a break, or ask to take a walk, rather than engage in physical or verbal aggression when frustrated, with adult prompts with 80 percent accuracy in four out of five trials.

36. Parents did not consent to the IEP. They disagreed with the amount of occupational therapy services provided, and with the speech and language goal. As a result of this IEP meeting, District realized that it should have been using the April 2011 goal for Student's compensatory services. Parents also did not agree with the speech and language compensatory time because it was not provided by a speech pathologist. During the meeting, Ms. Silvers responded to this concern, and explained that the District had the discretion to decide whether a speech and language pathologist assistant could deliver services to a student.

37. By letter dated March 26, 2014, Dr. Trivirio, Leichman's principal, attempted to resolve Parents' dissatisfaction with Student's recent IEP's. His letter noted that Parents had agreed to the April 7, 2011 IEP that was developed at Student's previous placement,

14

North Hollywood. Dr. Trivirio confirmed that the school staff would implement those goals as stay put. Dr. Trivirio also noted that Parents had agreed with the October 25, 2013 IEP, to the extent that it offered placement at Leichman, compensatory occupational therapy and speech and language services, and other services. The letter then referred to Parents' failure to sign the January 22, 2014, IEP, or reveal their disagreement with the IEP, and stated that Parents had not returned staff's calls to discuss the IEP. The letter expressed Dr. Trivirio's concern that, since Student would be reaching the age of 20, it was very important that the "best possible" IEP be developed and implemented. The letter closed by confirming that staff would implement, as stay put, the goals from Student April 7, 2011 IEP, and the services and compensatory time from the October 25,

2013 IEP. Also on March 26 2014, Dr. Trivirio forwarded this letter to school staff via e-mail.

38. Student's occupational therapy goal remained the same for all of his occupational therapy services both prior to and subsequent to the January 22, 2014 IEP and Dr. Trivirio's March 26, 2014 e-mail, as the occupational therapists had been using the goal in the April 2011 IEP, for all of Student's occupational therapy throughout the 2013-2014 school year.

39. Subsequent to the time of the January 22, 2014 IEP team meeting, Student's speech and language therapists began to use the speech and language goal from the April 2011 IEP. Sandra Silvers testified that the two goals were similar, in that they both involved inferring information, verbalizing information, attending, eye contact, and cause and effect. Moreover, she implemented the goals the same way. For example, regardless of which of the two goals she used, she would implement the goal by providing Student with an imaginary social situation and helping him decide what to say in that situation.

Occupational Therapy and Speech and Language Services at Beginning of the 2014-2015 School Year

39. Charles Gibson, a District occupational therapist, testified at hearing. He provided all of Student's compensatory and regular occupational therapy services on an individual basis from October 2014 throughout the 2014-2015 school year. Mr. Gibson has a B.S. in occupational therapy, and has a current occupational therapy license. He has been employed by District as an occupational therapist for eight years. While providing Student's services during the fall of 2014, he used the goal in the April 2011 IEP.

40. Stacy Hotchkiss, a speech and language pathologist, also testified. She received a bachelor's degree in communicative disorders and deaf studies from California State University, Northridge, and a master's degree in speech and language pathology from California State University, Fresno. Ms. Hotchkiss holds a certificate of clinical competency

**SpecialEdConnection® Case Report**

from the American Speech-Hearing Association, and a current California license. She has been employed by District as a speech and language pathologist for four

15

years and provided Student's regular speech and language therapy during the 2014-2015 school year. A District speech language pathology assistant, Dana Aldridge, provided Student's compensatory speech and language services, under the supervision of

Ms. Hotchkiss. Ms. Hotchkiss provided the regular services on a collaborative model which involved both individual and group services. In her opinion, pragmatic language skills were best taught in a small group with Student's peers. The compensatory services were provided on an individual basis. Both Ms. Hotchkiss and Ms. Aldridge used the speech and language goal in the April 2011 IEP in providing services to Student during the fall of 2014.

November 7, 2014 IEP

42. On November 7, 2014, District convened Student's annual IEP. 9 The IEP team included all required members, including Dr. Trivifio, Mr. Gibson, Ms. Hotchkiss, and Father. Father's attorney also attended the meeting. Student was invited to the meeting, but did not attend. The team reviewed Student's progress on goals and discussed present levels of writing, functional math, communication, English Language Development, vocational, sensory processing (occupational therapy), and behavior. The speech and language pathologist specified in the present levels of performance that Student was working on the pragmatics goal contained in the April 2011 IEP, but, since Student had had the goal for a while and was making minimal progress on it, she suggested that the goal be modified. The team followed her recommendation and modified the goal. The occupational therapist specified in the present levels of performance that he was working on the occupational therapy goal contained in the April 2011 IEP. The occupational goal was modified slightly. Student was to attend to and complete other directed

activity for at least 20 minutes, which was an increase from the 15 minutes that had been included in the goal in the previous IEP's.

43. The team again decided to place Student at Leichman, in the special education class 100 percent of the time, on an alternate curriculum, with home to school transportation. The team also offered summer school, with home to school transportation. Student was to have a full-time one-to-one behavior aide from a nonpublic agency and behavior supervision services, and a District behavior aide on the bus. The behavioral aide was provided for 425 minutes per day, and the behavior supervision was provided for 480 minutes monthly, with fewer minutes of each provided for summer school. The team also offered regular speech and language services and occupational therapy services, in addition to the compensatory speech and language and occupational therapy services ordered in the September 2013 Decision. The IEP documented that Student had completed 55.5 hours of the 78 hours of compensatory speech and language services and that Student had completed 21 of the 39 sessions of compensatory occupational therapy services.

9 Previously, in May 2014, District convened an amendment IEP meeting as a result of a behavioral incident involving Student. The amendment IEP is not at issue in this matter.

44.

16

The IEP included a behavior support plan, to address Student's outbursts, rage, and explosive reactions, and an individual transition plan. The individual transition plan noted that Student was enrolled in the Practical Assessment Exploration System course, as well as another vocational class during his school day. The individual transition plan was largely similar to the plan in the January 22, 2014 IEP. The plan in this IEP substituted learning kitchen safety as an independent living activity instead of the performance of household chores.

Copyright © 2016 LRP Publications

Father signed this IEP on December 12, 2015. 10 Father noted on the IEP that he agreed to the IEP with the exception of placement, as he wanted Student to attend another high school. Father specifically agreed to the goals, services, and program. He objected to how the compensatory hours were provided, and requested a review of the compensatory hours and whether they were provided by a qualified provider. Father did not receive a copy of this IEP at the time he signed his consent, as the system was unable to generate a copy of it at that time.

After Father signed the November 7, 2014 IEP, Mr. Gibson, Student's occupational therapist during the entire 2014-2015 school year, proceeded to provide all of Student's occupational therapy services using the goal in the November 7, 2014 IEP. Similarly, after the IEP was signed, Student's speech and language providers proceeded to provide all of Student's speech and language services using the new goal in the November 7, 2014 IEP.

Behavior Incident of December 1, 2014

On the morning of December 1, 2014, Student had a behavioral outburst at school. Gabriel Feliciano, Student's special education assistant on the bus that morning, testified about Student's outburst. Mr. Feliciano escorted Student from the bus to his classroom. As soon as Mr. Feliciano and Student entered the classroom, Student attempted to access a computer in the classroom. Student was not permitted to access the internet because of his tendency to visit pornographic websites. Mr. Feliciano instructed Student not to touch the computer. Student walked away from the computer, but then quickly went back to it. Mr. Feliciano suggested that Student put his backpack away, but Student made a fist, turned to Mr. Feliciano, and punched him in the face. Mr. Feliciano called for help, and soon a substitute teacher arrived. Dr. Triviflo also arrived, to find Mr. Feliciano sitting on the floor with Student, holding him to keep him calm and safe. Dr. Triviflo assisted

Mr. Feliciano in helping Student get up. Then Dr. Triviflo called for another special education

assistant, Tom Meier, to come to the classroom. Joe Norman, the special

10 The signature page reflected that the IEP was signed on December 11, 2014, but evidence at hearing demonstrated that this date was erroneous, and that Father signed the IEP on December 12, 2014.

education assistant who was assigned to the classroom, appeared and also assisted.

Dr. Trivirio had Mr. Meier take the lead and Mr. Meier began to talk to Student to try to de-escalate him. Mr. Feliciano exited the room. He sustained not only the facial punch but also some mild abrasions to his arm from Student grabbing him.

48. Then Student began to attack staff. He tossed chairs at them, and kicked and attacked Mr. Meier. Mr. Meier sustained a bruise on his right leg, below the knee.

Dr. Trivirio and Mr. Norman tried to separate Student and Mr. Meier. Student proved too strong for them, so they placed Student on a mat and Dr. Trivirio, Mr. Norman, andMr. Meier held him down on the mat for approximately two minutes. Student calmed down, and Mr. Meier encouraged Student to stay seated on the mat.

49. Dr. Trivirio then directed the main office staff to call Parents and Ms. Bahy, Student's behavior supervisor from Total Education Solutions. Staff also called Student's sister. Ms. Bahy informed staff that five of her behavior aides were absent, and there was nobody to substitute for Student's aide. After being calm for a few minutes, Student again became verbally and physically aggressive towards Mr. Meier. Mr. Meier used a mat to block Student, but his efforts were not sufficient. Dr. Trivirio and Mr. Norman had to assist in separating Student from Mr. Meier. The three of them again placed Student on a mat and assisted him down. Student calmed down in approximately three minutes and then stayed seated on the mat. They moved Student to another, empty classroom, where Student sat and lay on a mat as the staff attended to him in rotation. Throughout this

incident, Student was verbally aggressive toward staff, and used foul language. During the incident, staff used non-violent crisis intervention techniques to control Student. Mr. Feliciano, Mr. Meier, Mr. Norman, and Dr. Trevirio had all had non-violent crisis intervention training.

50. Dr. Trivirio completed a Behavioral Emergency Report for this incident, which included statements from Dr. Trivirio, Mr. Feliciano, and Mr. Meier, who also testified at hearing.

51. District convened an amendment IEP meeting on December 12, 2014, to review the events of December 1, 2014, to update Student's present levels of performance in the area of behavior, and to update Student's behavior support plan and the interim behavior response plan. Father and his attorney were present at the meeting. Student was invited to the meeting, but he did not attend. No substantive changes were made to the goals and services included in the November 7, 2014 IEP. Prior to the IEP meeting, a school staff member advised Father not to believe Dr. Trivirio's version of the December 1, 2014, behavior incident." Student presented no testimony from this staff member, or any other evidence, that any reports or statements of the participants in the December 1, 2014, incident were untrue.

11 At hearing, Father identified this staff member.

17

52.

18

Staff sent the December 12, 2014 IEP home in Student's backpack for signature on or about December 19, 2014. Parents did not respond. Dr. Trivirio wrote a letter to Father, dated January 16, 2015, in which he thanked Father for signing the November 7, 2014 IEP. He included a copy of the November 7, 2014 IEP with the letter. Additionally, he included a copy of the December 12, 2014 IEP, for Parents' signature. He mentioned that at the next IEP

team meeting the team would consider Parents' request regarding placement of Student at another high school. The letter also noted that Student would reach the age of 21 in March, and that his triennial IEP had was due to be completed by April 11, 2015. He enclosed an assessment plan for Father's signature, and requested that Father return the signed assessment plan as soon as possible so that the assessments could begin. The letter specified that, at the triennial IEP meeting, the team would review the assessments, develop an IEP, and address parental concerns regarding Student's placements.

Then, not having received any response, staff sent the signature page of this IEP to Parents and their lawyer on February 6, 2015. Staff received no response. Therefore, on February 19, 2015, staff again sent the signature page and a copy of the IEP to Parents and lawyer. Parents never signed the December 12, 2014 IEP.

At the same time as Dr. Trivirio and his staff attempted to obtain signatures on the December IEP, staff also attempted to contact Parents to agree on dates for the triennial IEP meeting, without success. By letter to Parents dated March 23, 2015, Dr. Trivirio documented these attempts. On January 16, 2015, and February 6, 2015, staff sent a communication in Student's backpack, and followed up with a telephone call; on February 19, 2015, staff sent a communication by certified letter, as well as in Student's backpack, and followed up with a telephone call; and on Wednesday, March 11, 2015, staff sent another communication in Student's backpack, and followed up with a telephone call. Dr. Trivirio's letter advised parents that the IEP meeting could not be delayed indefinitely, and proposed that the meeting be held on April 8, 9, or 10, 2015. His letter included an IEP Notification Form, and advised that the form should be returned at least two days prior to the date Parents' selected. The letter stated that if Parents' did not confirm a date for the IEP meeting, and did not attend on one of the proposed dates as requested in the letter, District would convene the IEP meeting on April 10, 2015, at 8:15 a.m., without their presence.

The letter further offered to hold the IEP meeting via a telephone conference if Parents were unable to attend in person.

By letter dated April 6, 2015, addressed to the District Superintendent, with copies to Dr. Trivirio and the District's executive director of special education, Father responded to Dr. Trivirio's March 23, 2015 letter. Father advised that he wondered why staff had not tried to contact him on his cell phone. He advised that the dates proposed by Dr. Trivirio were not convenient for him, but he was available at the end of April. Father also wrote that he needed the behavioral supervisor, the occupational therapist, and the speech and language therapist to provide him with reports, and he requested that the reports be sent to him five days before the meeting, pursuant to California law. He requested the

19

sign-in log for the occupational therapist and speech and language therapist who provided the compensatory hours. He also requested that a state certified interpreter be present at the meeting, or there would be no meeting. The letter requested that, should District deny any of the requests in his letter, he wanted prior written notice, pursuant to California law.

By letter dated April 13, 2015, which was similar to his letter of March 23, 2015, Dr. Trivirio again documented staff's attempts to contact Parents regarding setting an IEP meeting date, and added to the list of attempts a phone call with Father on April 10, 2015. Dr. Trivirio reiterated that he had not received written confirmation from Parents regarding the IEP meeting. He enclosed an IEP notification that included the same dates as he had previously proposed, along with April 29, 2015, at 8:15 a.m., per Father's request. The letter again requested that Parents sign the IEP notification form and return it two days prior to the IEP date they selected. Again, the letter warned that if Parents did not confirm their attendance and did not attend on one of the dates

proposed in the letter, as requested, District would convene the IEP meeting on April 29, 2015, at 8:15 a.m., without their presence. If Parents were unable to attend in person, the letter offered that the meeting could be conducted via a telephone conference.

On April 15, 2015, District received Parents' signed agreement to the meeting day of April 29, 2015, at 8:15 a.m. Parents crossed out the part of the form that stated that the District may proceed with the meeting if Parents were unable to attend.

Also on April 15, 2015, Parents returned the signed assessment plan to District, consenting to the assessment. Parents had originally returned the signed assessment plan form to District on April 8, 2015. However, they had failed to check the box that they consented to the assessment, so the District could not begin the assessments until April 15, 2015, when District received Parents' actual consent.

April 29, 2015 IEP Meeting

District convened Student's triennial IEP on April 29, 2015. Parents had not arrived by the agreed time of 8:15 a.m. Staff called Father's cell phone in an attempt to find out whether Parents would be attending the meeting, but received no answer. The meeting began at 8:35 a.m., without Father's presence. The IEP team included Dr. Trivirio, a special education teacher, two District administrators, Ms. Bahy (the behavioral supervisor), the speech and language and occupational therapists, a transition specialist, and a District interpreter. Student had been invited, but he did not attend. Either a service provider or a teacher was presenting a report regarding Student's progress or status when, at approximately 8:45 a.m., Father appeared. The witnesses varied on the details of what occurred, but several witnesses recalled a welcoming gesture to Father by someone on the team. Father recalled that Mr. Gibson, the occupational therapist, offered him a seat when Father arrived, but no other witness at hearing recalled this, including Mr. Gibson. In general terms, Father was upset that the meeting had started without him. Father did not request that the meeting

start over. Father told the group that Mother would not be coming to the meeting. Father asked for reports, some of which had been sent to him previously. He

20

was not pleased to learn that the interpreter was a District interpreter. Father stated that the meeting was adjourned and left, within approximately four or five minutes. Nobody requested that Father leave the meeting, and there was some evidence that Dr. Trivirio asked Father to stay. Father recalled that, before he left the meeting, Ms. Bahy and Mr. Gibson provided him with copies of their reports regarding Student's present levels of performance. The meeting continued without Father's presence. Mother never appeared.

60. District reviewed Student's progress on his goals, and updated Student's present levels of performance, goals, and the transition plan. District offered Student placement for 100 percent of his school day in the Leichman special day program on the alternative curriculum, with summer school, with the same related services, except for the compensatory speech and language services. District noted that Student had completed the 78 compensatory speech and language services ordered in the September 26, 2013 Decision, and therefore did not offer such services in the IEP. The IEP noted that Father had requested a change of placement, but, since Father had left the meeting, Father's request would be considered at the next IEP meeting.

61. By letter to Parents dated May 8, 2015, Dr. Trivirio expressed his regret that Parents were unable to participate in the IEP meeting. He mentioned that since the assessment plan was not returned in a timely fashion, there was insufficient time to complete the assessments prior to the April 29, 2015 IEP, and stated that the IEP team would meet in the future to review the assessment reports.

62. The April 29, 2015 IEP was not completed. Since the legal timelines for conducting the assessments and holding the IEP meeting extended

beyond the 2014-2015 school year, District intended to complete the assessments and hold an IEP meeting early in the 2015-2016 school year.

LEGAL CONCLUSIONS

Introduction: Legal Framework Under the IDEA12

1. This hearing was held under the IDEA, its regulations, and California statutes

and regulations intended to implement the IDEA and its regulations. (20 U.S.C. § 1400 et. seq.; 34 C.F.R. § 300.1 (2006) et seq.; 13 Ed. Code, § 56000, et seq.; Cal. Code. Regs., tit.

12 Unless otherwise indicated, the legal citations in this introduction are incorporated by reference into the analysis of each issue decided below.

13 Unless otherwise indicated, all references are to the 2006 edition of the Code of Federal Regulations.

21

5, § 3000 et seq.) The main purposes of the IDEA are: (1) to ensure that all children with disabilities have available to them a FAPE that emphasizes special education and related services designed to meet their unique needs and prepare them for employment and independent living; and (2) to ensure that the rights of children with disabilities and their parents are protected. (20 U.S.C. § 1400(d)(1); see Ed. Code, § 56000, subd. (a).)

2. A FAPE means special education and related services that are available to an eligible child at no charge to the parent or guardian, meet state educational standards, and conform to the child's IEP. (20 U.S.C. § 1401(9); 34 C.F.R. § 300.17.) "Special education" is instruction specially designed to meet the unique needs of a child with a disability. (20 U.S.C. § 1401(29); 34 C.F.R. § 300.39; Ed. Code, § 56031.) "Related services" are transportation and other developmental, corrective, and supportive services that are required to assist the child in benefiting from special education. (20 U.S.C. § 1401(26); 34 C.F.R. § 300.34; Ed. Code, § 56363,

subd. (a.).) In general, an IEP is a written statement for each child with a disability that is developed under the IDEA's procedures with the participation of parents and school personnel. The IEP describes the child's needs, academic and functional goals related to those needs, and a statement of the special education, related services, and program modifications and accommodations that will be provided for the child to advance in attaining the goals, make progress in the general education curriculum, and participate in education with disabled and non-disabled peers. (20 U.S.C. §§ 1401(14), 1414(d); Ed. Code, § 56032.)

3. In Board of Education of the Hendrick Hudson Central School Dist. v. Rowley (1982) 458 U.S. 176, 201 [102 S.Ct. 3034, 73 L.Ed.2d 690] (Rowley), the Supreme Court held that "the 'basic floor of opportunity' provided by the [IDEA] consists of access to specialized instruction and related services which are individually designed to provide educational benefit to [a child with special needs]." Rowley expressly rejected an interpretation of the IDEA that would require a school district to "maximize the potential" of each special needs child "commensurate with the opportunity provided" to typically developing peers. (Id. at p. 200.) Instead, the Rowley court decided that the FAPE requirement of the IDEA was met when a child received access to an education that was reasonably calculated to "confer some educational benefit" upon the child. (Id. at pp. 200, 203-204.) The Ninth Circuit Court of Appeals has held that despite legislative changes to special education laws since Rowley, Congress has not changed the definition of a FAPE articulated by the Supreme Court in that case. (J.L. v. Mercer Island School Dist. (9th Cir. 2010) 592 F.3d 938, 950 [In enacting the IDEA 1997, Congress was presumed to be aware of the Rowley standard and could have expressly changed it if it desired to do so.].) Although sometimes described in Ninth Circuit cases as "educational benefit," "some educational benefit," or "meaningful educational benefit," all of these phrases mean the Rowley standard, which should be applied to determine whether an individual child was provided a FAPE. (Id. at p. 950, fn. 10.)

4.

22

The IDEA affords parents and local educational agencies the procedural protection of an impartial due process hearing with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a FAPE to the child. (20 U.S.C. § 1415(b)(6); 34 C.F.R. 300.511; Ed. Code, §§ 56501, 56502, 56505; Cal. Code Regs., tit. 5, § 3082.) The party requesting the hearing is limited to the issues alleged in the complaint, unless the other party consents. (20 U.S.C. § 1415(f)(3)(B); Ed. Code, § 56502, subd. (i).) Subject to limited exceptions, a request for a due process hearing must be filed within two years from the date the party initiating the request knew or had reason to know of the facts underlying the basis for the request. (20 U.S.C. § 1415(f)(3)(C), (D).) At the hearing, the party filing the complaint has the burden of persuasion by a preponderance of the evidence. (Schaffer v. Weast (2005) 546 U.S. 56-62 [126 S.Ct. 528, 163 L.Ed.2d 387]; see 20 U.S.C. § 1415(i)(2)(C)(iii) [standard of review for IDEA administrative hearing decision is preponderance of the evidence].) In this case, Student has the burden of persuasion as to all issues.

Issue 1A: Predetermination of Goals in October 25, 2013 IEP

Student contends that the October 25, 2013 IEP failed to offer a FAPE because the IEP team predetermined Student's IEP goals, in that goals were already drafted at the time of the IEP meeting. District contends that the IEP team did not predetermine the goals, but merely presented draft goals at the meeting.

6. States must establish and maintain certain procedural safeguards to ensure that each student with a disability receives the FAPE to which the student is entitled, and that parents are involved in the formulation of the student's educational program. (W. G., et al. v. Board of Trustees of Target Range School

Dist., etc. (9th Cir. 1992) 960 F.2d 1479, 1483.) (Target Range.) Citing Rowley, supra, the court also recognized the importance of adherence to the procedural requirements of the IDEA, but determined that procedural flaws do not automatically require a finding of a denial of a FAPE. (Target Range, supra, at p. 1484.) This principle was subsequently codified in the IDEA and Education Code, both of which provide that a procedural violation only constitutes a denial of FAPE if the violation (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decision making process regarding the provision of a FAPE to the child; or (3) caused a deprivation of educational benefits. (20 U.S.C. § 1415(f)(3)(E)(ii); Ed. Code, § 56505, subd. (f)(2).)

7. Predetermination of a student's IEP is a procedural violation that deprives a student of a FAPE in those instances in which the IEP is developed without parental involvement in developing the IEP. (Deal v. Hamilton County Bd. of Educ. (6th Cir. 2004) 392 F. 2d 840, 857-859.) (Deal). To fulfill the goal of parental participation in the IEP process, the school district is required to conduct a meaningful IEP meeting. (Target Range, supra, 960 F.2d at p. 1485.) A parent has meaningfully participated in the development of an IEP when she is informed of her child's problems, attends the IEP meeting, expresses her

23

disagreement regarding the IEP team's conclusions, and requests revisions in the IEP. (XL. v. Knox County Schools (6th Cir. 2003) 315 F.3d 688, 693; Fuhrmann v. East Hanover Bd. of Educ. (3rd Cir. 1993) 993 F.2d 1031, 1036 [parent who had an opportunity to discuss a proposed IEP and whose concerns were considered by the IEP team has participated in the IEP process in a meaningful way].) "A school district violates IDEA procedures if it independently develops an IEP, without meaningful parental participation, and then simply presents the IEP to the parent for ratification." (Ms. S. ex rel G. v.

Vashon Island School Dist. (9th Cir. 2003) 337 F.3d 1115, 1131.) However, an IEP need not conform to a parent's wishes to be sufficient or appropriate. (Shaw v. District of Columbia (D.D.C. 2002) 238 F. Supp. 2d 127, 139 [IDEA did not provide for an "education . . . designed according to the parent's desires."].) The relevant question in considering whether there has been predetermination is whether the school district came to the IEP meeting with an open mind. (Deal, supra, 392 F.3rd at 858; Doyle v. Arlington County School Bd. (1982) 806 F.Supp. 1253, 1262.)

8. Student's contention is unmeritorious. The September 2013 Decision required District to hold an IEP meeting within 30 days of the Decision to offer Student a FAPE, as he was still eligible for special education and related services. To offer Student a FAPE, District was required to develop present levels of performance, and goals, which are an integral part of an IEP. (20 USC § 1414(d)(1)(A); 34 C.F.R. § 300.320.)

9. The goals were drafted prior to the October 25, 2013 IEP meeting, but it does not follow that the goals were predetermined. Rather, the goals were discussed at the IEP meeting, and Parents had opportunities to raise their questions and concerns about the goals, and about any other issues in the IEP meeting. In this regard, Parents' requests for assessments were considered and the team decided to conduct assessments, which is further evidence of Parents' participation in this IEP meeting. Parents also were able to express their objections to the presence of the particular speech and language therapist and occupational therapist at the meeting. Parents did not raise any specific questions or concerns about the goals at the meeting, but there was no evidence that the IEP team would not have responded to parental input on the goals. In fact, the evidence was to the contrary. The October 25, 2013 IEP meeting was a meaningful meeting. There was no evidence that the goals were predetermined such that they were presented to Parents on a "take it or leave it" basis.

10. The goals were not predetermined and Student was not deprived of a FAPE in this regard.

Copyright © 2016 LRP Publications

Issues 1B and 1C: Failure to Complete Assessments and to Present Assessment Reports

9. These issues are related to Student's contentions regarding predetermination of goals. Student contends that the purpose of the October 25, 2013 IEP meeting was to discuss placement and compensatory services, and not goals. Student contends that District did not complete assessments and present assessment reports at the October 25, 2013 IEP meeting,

24

and thus there was nothing upon which to base the goals. 14 District contends that goals may be developed without assessments, and that the September 2013 Decision did not require that assessments be performed prior to the October 25, 2013 IEP meeting.

12. The failure to comply with procedures for assessments is a procedural violation of the IDEA. (Park v. Anaheim Union High School Dist. (9th Cir. 2005) 464 F.3d 1025, 1031.) A school district shall develop a proposed assessment plan within 15 calendar days of a request for assessment, unless the parties agree in writing to an extension. (Ed. Code, § 56043, subd. (a).) A parent shall have at least 15 calendar days from the receipt of the proposed assessment plan to consent to the proposed assessment plan. (Ed.

Code,§ 56403, subd. (b).) With the exception of a few circumstances pertaining to assessment requests towards the end of the school year, a school district must conduct the assessment and convene an IEP to discuss the assessment no later than 60 calendar days from the date of receipt of the parent's written consent to assessment (excluding days of school vacation in excess of five school days), unless the parent agreed in writing to an extension. (Ed. Code, § 56043, subd. (d).)

13. Student's contentions are unmeritorious. First, the September 2013 Decision required District to hold an IEP meeting within 30 days of the Decision

to offer Student placement and a FAPE, as he was still eligible for special education and related services. As was discussed in Legal Conclusion 8, to offer Student a FAPE, District was required to develop goals.

14. Second, there is no legal requirement that present levels of performance and goals be based only upon formal assessments performed within a month prior to the IEP meeting. As cited above, when a District performs an assessment, it has 60 days from the date a parent consents to the assessment in which to complete the assessment and hold an IEP meeting. In this case, however, the September 2013 Decision ordered that an IEP meeting be held within 30 days from the date of the Decision. This deadline did not leave District sufficient time to conduct assessments prior to the October 25, 2013 IEP meeting and, indeed, the September 2013 Decision did not order District to complete assessments in preparation for the subject IEP meeting. Therefore, instead of assessments, the evidence demonstrated that the present levels of performance and the goals were based upon such acceptable matters as Student's prior goals, teacher and service provider observations, prior IEP's, prior assessments, and record reviews.

14 In his closing brief, Student asserts for the first time that the occupational therapy and speech and language goals were inappropriate because Parents did not believe that the drafters of those goals were credible witnesses. At hearing, however, Father testified that the only objection he had to the October 25, 2013 IEP goals was that they had been developed in the absence of new assessments. Since Student's new objections to the goals based upon the credibility of their drafters were not raised in the Complaint, they shall not be further addressed in this Decision. (Ed. Code, § 56502, subd. (i).)

15.

25

District was not required to conduct assessments and prepare assessment reports prior to the October

**SpecialEdConnection® Case Report**

25, 2013 IEP meeting. Student was not deprived of a FAPE in this regard.

Issues 1D and 1 E: Failure to Discuss Compensatory Language and Speech Services and Compensatory Occupational Therapy Services at the October 25, 2013 IEP Meeting

These issues are also closely related to Student's contention pertaining to predetermination. Student contends that the team never discussed the compensatory speech and language and occupational therapy services as ordered in the September 2013 Decision at the October 25, 2013 IEP meeting because Father stopped the meeting, and therefore Parents did not participate in the discussion of these compensatory services. Student further contends that Father stopped the meeting because he was displeased with various events that occurred at the meeting. District contends that these compensatory services were discussed at the meeting.

17. Legal Conclusions 6 and 7 are incorporated by this reference.

18. District did not deprive Student of a FAPE in this regard, because Student did not sustain his burden of proving that the compensatory services were not discussed at the October 25, 2013 IEP meeting. The September 2013 Decision ordered District to provide specified amounts of compensatory language and speech and compensatory occupational therapy services. The October 25, 2013 IEP meeting was specifically convened to address these matters, and others, in conformity with the Order in the September 2013 Decision. Those compensatory services were specifically included in the October 25, 2013 IEP pursuant to the September 2013 Decision, and Parents specifically mentioned their consent to these services on the signature page of the IEP.

19. Of all the witnesses who testified regarding the events at the October 25, 2013, only Father recalled that he stopped this meeting. All other evidence demonstrated that the meeting was not stopped, but rather that the necessary elements of an IEP, such as present levels of performance, goals,

placement, services, a behavior support plan, and a transition plan, were considered at the meeting, and the meeting proceeded to its conclusion. The IEP document itself did not contain any mention that Parents stopped the meeting, or left the meeting, or that the meeting was otherwise curtailed, although it noted other comments of Parents. Parents signed the IEP, and inserted comments on the signature page of the IEP, but their comments did not mention that the meeting had been stopped, or protest that there had been no discussion of the compensatory services, or indicate in any manner that Parents wished to discuss the compensatory services further.

20. Father was displeased with various events that took place during the course of the meeting, such as the fact that goals were developed without assessments having been performed, and that the particular occupational therapist and speech and language therapist

26

were present. Father expressed at least some of his displeasure regarding these matters during the meeting. However, Father's negative attitudes on these matters at the meeting did not, in themselves, mean that District violated the order in the September 2013 Decision that Parents have the opportunity to meaningfully participate in the meeting. Nor did they justify any attempt by Father to stop the meeting by leaving the meeting or by any other actions intended to prevent the meeting from proceeding so that it could not be completed in a timely fashion pursuant to the September 2013 Decision. The weight of the evidence demonstrated that the compensatory speech and language and occupational therapy services were appropriately discussed. Parents signed their consent to that portion of the IEP that offered these services. District did not deprive Student of a FAPE on this ground. 15

Issues 2A and B: Failure of District to Invite Student's Behavior Supervisor to January 22, 2014 IEP Meeting, and of the IEP to Offer Student a Behavior Support Plan

21. Student contends that Ms. Bahy, Student's behavior support supervisor, was not invited to the January 22, 2014 IEP meeting. He further contends that the behavior support plan was not discussed at the meeting, so he was unaware that there was a behavior support plan at that meeting.

22. In general, an IEP team must include a student's parents; not less than one special education teacher of the child; not less than one regular education teacher of the child if the child is, or may be, participating in the regular education environment; a district administrator; an individual who can interpret the instructional implications of evaluation results; at the discretion of the parent or the agency, other individuals, such as related services personnel, who have knowledge or special expertise regarding the child; and, when appropriate, the child. (34 C.F.R. § 300.321(a); Ed. Code, § 56341, subd. (b).)

15 Student did not address Issues 1D and 1E in his closing brief, although those issues were discussed and agreed to as issues in this matter both at the PHC and again at the beginning of the hearing in this matter. Rather, in his closing brief Student asserts, for the first time, that the occupational therapy goal and speech and language goals were inappropriate, because Parents did not believe that the drafters of those goals were credible individuals. At hearing, Student presented no evidence that any of the goals in this IEP were substantively inappropriate, and Student has presented no legal authority that a goal is inappropriate simply because Parents question the credibility of the drafter of the goal. Additionally, in his closing brief Student contends that he requested to have Student's behavior supervisor present at the October 25, 2013 IEP meeting. The behavior supervisor was invited but did not attend the meeting, and Student provided no evidence or authority that District thereby deprived Student of a FAPE. Since these are all new matters that were not raised in Student's Complaint, they will not be further considered in this Decision. (Ed. Code, § 56502, subd. (i).)

23.

27

State and federal law requires school districts to address behavior problems that affect the education of a child with a disability or other students. An IEP team must consider whether a child's behavior impedes his or her learning or that of others, and, if the team determines that it does, the team must consider the use of positive behavioral interventions and supports and other strategies to address the behavior. (20 U.S.C.

§ 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i); Ed. Code, § 56341.1, subds. (b)(1) and (c).) An IEP that fails to address a child's behavioral issues that affect the child's learning denies a student a FAPE. (County of San Diego v. California Special Ed. Hearing Office (9th Cir. 1996) 93 F.3 1458, 1467-1468.)

Student's contentions that he was deprived of a FAPE because the January 22, 2014 IEP failed to offer Student a behavior support plan, and because Student's behavior supervisor was not invited to the meeting, are unmeritorious because they are based upon incorrect facts. The January 22, 2014 IEP included a behavior support plan which was based on a functional analysis assessment, and the evidence demonstrated that both the behavior support plan and the functional analysis assessment were reviewed and discussed at the meeting. There was no evidence that Parents had any questions or concerns about these items. Furthermore, Ms. Bahy, Student's behavior supervisor, was present at the January 22, 2014 IEP team meeting. Therefore, Student has failed to demonstrate that District deprived him of a FAPE with respect to this issue.

Issue 2C: Failure of the January 22, 2014 IEP to Include the Independent Assessor's Recommendations Regarding Student's Transition Plan

Student contends that the January 22, 2014 IEP failed to include the recommendations of Kerri Giddens from Tierra del Sol regarding Student's

**SpecialEdConnection® Case Report**

transition plan. District contends that Ms. Giddens attended the IEP meeting, presented her report, and the IEP team incorporated her recommendations in the transition plan and throughout the IEP.

26. If a parent obtains an independent assessment at public expense, or shares with the school district an evaluation obtained at private expense, the results of the evaluation must be considered by the school district, if it meets agency criteria, in any decision made with respect to the provision of a FAPE. (34 C.F.R. § 300.502(c); Ed. Code §§ 56341, subd. (b)(1) and 56381, subd. (b).) A district's failure to consider an independent assessment is a procedural violation. (Marc M ex rel. Aidan M v. Dept. of Ed. (D. Hawaii 2011) 762 F. Supp 1235, 1245.) Additionally, here, District was obligated to consider the recommendations in the Tierra del Sol report by reason of the September 2013 Decision.

27. Student's contention is unmeritorious. First, when Ms. Giddens presented her report at the January 22, 2014 IEP meeting the team considered her report. As was discussed in the Factual Findings, several of her recommendations were incorporated into a variety of aspects of Student's IEP, such as the functional writing and mathematics goals, and the vocational goal. The report recommendations also informed Student's transition activities, as the staff focused on teaching Student task analysis, social skills, and performing chores.

28.

28

Second, Student did not demonstrate that any failure of District to include any of Ms. Giddens' recommendations in the transition plan or Student's educational program constituted a deprivation of a FAPE. In this regard, at hearing Student focused on District's failure to follow Ms. Giddens' recommendation that a behavioral specialist be retained to teach Student appropriate self-regulation so Student would not seek pornographic websites while he was on the internet. The evidence reflected

that District staff and Student's behavior providers from Total Education Solutions were well aware of Student's intense desire to locate such websites every time he was on the internet, and of his aggressive behavior when his attempts to access such websites were frustrated by staff. Accordingly, Student's behavior goals addressed how Student could self-regulate to reduce his aggressive behaviors when he was frustrated, and his educational program included learning to use computers that were not connected to the internet. These are all appropriate foundational skills to eventually prepare Student for a time when he might be able to successfully access the internet for socially acceptable purposes.

Nobody from Tierra del Sol testified at hearing. There was no evidence that any behaviorist who was to provide educationally-related behavioral services would be able to teach Student to control his intense proclivities to seek inappropriate websites, that Student was ready or able to regulate such behavior at the time of the January 22, 2014 IEP or at any other relevant time, or that Student required such intervention to receive some educational benefit. In short, there was no evidence that all of the recommendations contained in the Tierra del Sol report were required for Student to receive a FAPE.

The IEP team did not fail to consider the Tierra del Sol report at the January 22, 2014 IEP, and Student did not demonstrate that District failed to incorporate its material and applicable recommendations into Student's transition plan or into his educational program. The transition plan and services included in Student's IEP were reasonably calculated to provide Student with some educational benefit. District did not deprive Student of a FAPE on these grounds.

Issue 3A: Failing to Use the Goals from Student's April 2011 IEP for Student's Regular and Ccompensatory Language and Speech Services

Student contends that Student's speech and language therapists should have used the goal from Student's April 2011, IEP in delivering services from

Copyright © 2016 LRP Publications

**SpecialEdConnection® Case Report**

the time of the October 25, 2013 IEP through December 12, 2014, as the April 2011 IEP was the last agreed upon IEP at that time.

30. District contends that the October 25, 2013 goal for speech and language services was implemented in a way that it used the skills in the April 2011 goal. In any event, the October 25, 2013 goal was used so briefly that there was no deprivation of a FAPE.

33.

29

If a parent consents to the provision of special education and related services to the student, but does not consent in writing to all of the components of an IEP, those components of the IEP to which the parent has consented shall be implemented. (Ed. Code, § 56346, subd. (e).) A failure to implement a student's IEP will constitute a denial of a FAPE if the failure was material. There is no statutory requirement that a district must perfectly adhere to an IEP, and, therefore, minor implementation failures will not be deemed a denial of a FAPE. A material failure to implement an IEP occurs when the services a school district provides to a disabled pupil fall significantly short of the services required by the IEP. (Van Duyn, et al. v. Baker School Dist. (9th Cir. 2007) 502 F.3d 811, at 822.) A party challenging the implementation of an IEP must show more than a de minimus failure to implement all elements of that IEP, and instead must demonstrate that the school district failed to implement substantial and significant provisions of the IEP. (Id., at p. 821.) "[T]he materiality standard does not require that the child suffer demonstrable educational harm in order to prevail." (Id., at p. 822.)

At the time of the October 25, 2013 IEP, Student's April 2011 IEP was the last agreed upon IEP, and therefore the goals from that IEP should have been used for all of Student's related services. Instead, District was using the language and speech goal from the October 25, 2013 IEP, but Parents had specifically refused to consent to the goals in that IEP.

District eventually realized its error. As of approximately late January 2014, District used the goal from Student's April 2011 IEP for his speech and language services, until December 2014, when Parents consented to the November 7, 2014 IEP. As a result, District used the incorrect goal for Student's speech and language services for less than three months, when school vacations and holidays are taken into account.

Student failed to demonstrate that District's use for less than three months of the language goal in the October 25, 2013 IEP, instead of the goal in the April 2011 IEP, constituted a failure to implement substantial and significant portions of Student's IEP. First, the evidence demonstrated that the implementation of the goal in the October 25, 2013 IEP involved use of the same skills as were the subject of the April 2011 IEP goal. Thus, the brief use of the October 2013 goal was an immaterial departure from the use of the April 2011 goal, and constituted a minor implementation failure.

Second, the services District provided to Student did not fall significantly short of the services required by the April 2011 IEP. Student presented no evidence that the goal that was used in place of the April 2011 IEP goal was substantively inappropriate in any way, or that Student failed to benefit from the goal. Indeed, Student made progress on the goal by the time of the January 22, 2014 IEP meeting. Under these circumstances, District did not deprive Student of a FAPE by briefly using the incorrect goal. Rather, the evidence demonstrated that the goal in the October 25, 2013 IEP was an appropriate goal for Student. There was no evidence that the use of the goal in the October 25, 2013 IEP was not reasonably calculated to provide Student some educational benefit. District did not deprive Student of a FAPE by failing to use the April 2011 IEP goal.

30

Issue 3B: Failing to Implement Student's Regular and Compensatory Occupational Therapy Services

---

Copyright © 2016 LRP Publications

Using Student's Last Agreed Upon Goals from His April 2011 IEP from October 25, 2013 until December 12, 2014

Student contends that District deprived Student of a FAPE because it provided both compensatory and regular occupational therapy services pursuant to the October 25, 2013 IEP goal until December 2014. Rather, District should have used the last agreed upon occupational therapy goal from the April 2011 IEP. District contends that it used the goal from the April 2011 IEP for all of Student's occupational therapy services.

38. Legal Conclusion 33 is incorporated by reference.

39. Student's position is unmeritorious. The evidence was uncontradicted that Student's occupational therapists were using the occupational therapy goal in the April 2011 IEP for both Student's regular and compensatory occupational therapy services throughout the relevant time period. District did not deprive Student of a FAPE on this ground.

Issue 3C: Changing Student's Language and Speech Services from Individual to Group Without Parents' Consent from October 2013

38. Student contends that District changed his speech services from individual to group without discussing it with Parents at an IEP meeting and obtaining written consent. District contends that, to the extent that this issue concerns the 78 hours of compensatory individual speech and language services ordered in the September 2013 Decision, OAH has no jurisdiction to enforce the implementation of the September 2013 Decision. District further contends that, in any event, the compensatory speech services were delivered in an individual setting. With respect to the 120 minutes per month of regular speech and language services offered in the October 2013 IEP, District contends that there was no evidence that the District changed the method of delivery of services from individual to group without Parents' knowledge or consent.

39. Services in the IEP cannot be changed without Parents' consent. (20 U.S.C. § 1414(d)(3)(d); Ed. Code, § 56380.1.)

40. OAH generally does not have jurisdiction to enforce its own orders. Wyner v. Manhattan Beach Unified Sch. Dist. (9th Cir. 2000) 223 F.3d 1026, 1028-1029.) A claim that a school district failed to comply with an order or the terms of a settlement agreement must be pursued through a separate compliance complaint procedure with the California Department of Education. (34 C.F.R. §300.151-153; Ed. Code, § 56500.2; Cal. Code Regs., tit. 5, § 4600 et seq.).

43.

31

However, OAH has jurisdiction to adjudicate a claim alleging a denial of FAPE as a result of violation of a settlement agreement, and by analogy, of an order. (Pedraza v. Alameda Unified Sch. Dist., (N.D. Cal. 2007) 2007 WL 949603 [when student alleges a denial of FAPE as a result of a violation of a settlement agreement, and not merely a breach of the settlement agreement, OAH has jurisdiction to adjudicate claims alleging denial of a FAPE.].)

Student has not brought an enforcement case but rather raises the issue of whether the District's failure to comply with the order in the September 2013 Decision resulted in a denial of a FAPE. Accordingly, OAH has jurisdiction to adjudicate Student's claim regarding the compensatory speech and language services.

COMPENSATORY SERVICES DURING THE 2013-2014 SCHOOL YEAR

District did not fully comply with the September 2013 Decision during the 2013-2014 school year, because the October 2013 IEP did not specify that Student's compensatory speech and language services would be provided on an individual basis. By not so specifying, the evidence demonstrated that the IEP left it to the discretion of the speech and language therapist as to whether the services would be provided

in an individual or small group setting. During the 2013-2014 school year, the first 30 minutes of Student's one hour compensatory speech and language sessions were provided on an individual basis, and the remaining 30 minutes of each session were provided in a small group setting.

However, Student did not meet his burden of proof that the failure of the District to provide Student his compensatory speech and language services on an exclusively individual basis during the 2013-2014 school year deprived Student of a FAPE. All of these services focused on pragmatics, and the evidence was uncontradicted that pragmatics were best worked on in a small group setting. It is true that Student had not met the April 2011 goal as of the time of the November 7, 2014 IEP, but there was no evidence that the failure to provide all of Student's compensatory services on an individual basis during the previous school year was a cause of Student's failure to make sufficient progress on the goal. Rather, as the November 7, 2014 IEP reflected, the speech and language therapist recommended changing the goal so that it addressed more of the foundational skills of pragmatic speech, and target proximity, body language, and eye contact, skills which the April 2011 goal assumed that Student had mastered, but with which he still struggled. The IEP team agreed, and the team changed the goal accordingly, but there was no evidence that Student's failure to master these skills was because he had not received individual compensatory speech and language therapy exclusively during the 2013-2014 school year. Therefore, Student was not deprived of a FAPE on this ground during the 2013-2014 school year.

COMPENSATORY SERVICES DURING THE 2014-2015 SCHOOL YEAR

The evidence demonstrated that Student's compensatory speech and language services were provided on an individual basis during the 2014-2015 school year as ordered in the September 2013 Decision. Therefore, even though the Student's IEP's did not specify that

32

the speech and language services were to be delivered only on an individual basis, they were so delivered. Therefore, Student was not deprived of a FAPE on this ground during the 2014-2015 school year.

REGULAR SPEECH AND LANGUAGE SERVICES

With respect to the regular speech and language services, none of Student's IEP's that are at issue in this case offered those services on an individual basis. Rather, the IEP's left it to the discretion of the speech and language provider as to whether those services would be provided on an individual basis or in a small group. Student produced no evidence that he and Parents had any expectation that Student's regular speech and language services would be provided on an individual basis. Therefore, Student's contention that the delivery of regular speech and language services was changed from individual to group without Parents' knowledge or consent is not meritorious.

Issue 4: Denial of a FAPE by Falsifying the Documentation of Student's December 1, 2014 Behavior Outburst

Student contends that the District's documentation of the December 1, 2014 behavioral event was falsified. Student contends that Father was told by a District staff member not to believe Dr. Trivirio's account of Student's behavioral incident of December 1, 2014, and he further contends the testimony of Mr. Feliciano at hearing was inconsistent with Dr. Trivirio's and Mr. Meier's accounts. District contends that the witnesses' versions of the event were consistent with each other, and that there was no evidence that District's documentation of the event was falsified.

50. Legal Conclusions 6 and 7 are incorporated by this reference.

Copyright © 2016 LRP Publications

51. Student presented no persuasive evidence that the District's documentation of Student's behavioral outburst on December 1, 2014, was inaccurate. Student relied upon the vague hearsay statement of a District staff member to Father that Dr. Trivirio's account of the event was not accurate. Student presented no evidence beyond that vague hearsay statement, and the staff member was not called to testify at hearing. Student presented no evidence that the December 1, 2014 incident occurred in any manner other than that which is set forth in the District's documentation, which was made at or about the time that the event occurred. The witnesses who contemporaneously documented their descriptions of the incident testified at hearing. Their testimony was materially consistent with each other's, and with the documentation of the incident, in that all agreed that Student erupted after being denied access to a classroom computer. During this event Student injured two classroom assistants, used foul language, and three staff members were required to calm him down with the use of nonviolent crisis intervention techniques. In his closing brief, Student did not cite any aspect of the documentation or testimony that was inconsistent. Student offered no evidence or legal authority to support his contention that District's documentation of the incident was falsified, and that Student was deprived of a FAPE as a result.

33

Issue 5: Failure to Provide Parents With a Copy of the Signed IEP Which Contained the Agreed-Upon Behavior Services

52. Student contends that Parents were not provided with an accurate copy of the November 7, 2014 IEP that he signed on December 12, 2014. Rather, Parents were provided a copy that did not contain the amount of behavioral services that the team had agreed to at the IEP meeting. Student contends that the amount of behavioral aide services agreed upon at the IEP meeting was 450 minutes per day, but the copy of the signed IEP District sent to Parents provided for 425 minutes per day of such

services. Additionally, Student contends that the amount of behavioral supervision services the team agreed upon at the IEP team meeting, was 600 minutes per month, and the copy of the signed IEP District sent to Parents provided only 480 minutes per month. District contends that Parents received a signed copy of the IEP by January 16, 2015, and regardless of whether the copy of the IEP it provided to Parents accurately reflected the number of minutes of behavior services that Parents agreed to at the IEP team meeting, the IEP provided a FAPE. District further contends that regardless of the number of minutes the IEP provided for the behavior aide, the behavior aide was present throughout Student's school day, and that Father did not notify the District that there was any error in the IEP.

53. Legal Conclusions 6, 7, and 41 are incorporated by this reference. The district must give the parent a copy of the IEP. (34 C.F.R. § 300.322(f); Ed. Code, § 56341.5, subd.(j).)

54. Student failed to meet his burden of proof that he was deprived of a FAPE regarding this issue. The evidence demonstrated that Father signed the November 7, 2014 IEP at the IEP meeting of December 12, 2014. Since the computer system was not working, District was unable to provide Father with a complete copy of the IEP at that time. By letter dated January 15, 2015, Dr. Triviflo sent Father a signed copy of the November 7, 2014 IEP.

55. Father's testimony that the copy of the signed IEP District sent to him contained a different number of minutes of behavior services than Parents agreed to at the IEP team meeting is not persuasive, primarily because Parents did not notify District of the error. Parents never advised District that the copy of the IEP Dr. Triviflo sent Father was not accurate in any manner, prior to the filing of this Complaint. It was not until hearing that Father specified that the copy of the November 7, 2014 IEP that he received was defective in that it did not contain the amount of behavioral services to which the parties had agreed at the IEP meeting. However, one would reasonably have expected Parents to have brought this situation

Copyright © 2016 LRP Publications

to District's attention immediately. Indeed, the evidence demonstrated that Parents were in contact with District during spring 2015, when they signed consent to the triennial assessments and selected a date for the April 2015 IEP meeting. Furthermore, Father wrote a letter dated April 6, 2015, to Dr. Triviflo as well as to the District Superintendent, in which Father expressed several concerns, and made several demands, but he did not mention that District had sent him an inaccurate copy of the signed November 7, 2014 IEP.

56.

34

Even if Father's testimony were persuasive, Student did not establish that District denied him a FAPE. The situation would be analogous to the situation when an IEP is not properly implemented, and the inquiry would become whether the behavioral services that District provided fell significantly short of the services to which District had allegedly agreed. (Van Duyn, et al. v. Baker School Dist., supra, 502 F. 3d 811, at 822.) The evidence at hearing was uncontradicted that Student received behavioral services on the school bus, and that his one-to-one behavioral aide provided services to Student throughout the entire school day. There was no evidence that the alleged reduction of two hours per month in the behavior supervision services that Student received under the November 7, 2014 IEP as compared to the amount of services to which Father allegedly agreed represented a failure to implement substantial and significant provisions of Student's IEP.

Student did not meet his burden of demonstrating that District deprived Student of a FAPE with respect to this issue.

Issue 6: Failing to Include Parents in the April 29, 2015 IEP Meeting

Student contends that Father was not permitted to participate in the April 29, 2015 IEP meeting.

District contends that Father voluntarily left the meeting and went home.

58. The Ninth Circuit considered the issue of parental participation in IEP meetings in the case of Doug C. v. Hawaii Dept. of Ed. (9th Cir. 2013) 720 F.3d 1038 (Doug C.) Doug C. involved a school district which held an annual IEP meeting despite the parent's last-minute inability, due to illness, to attend the meeting on the day the meeting was scheduled, and despite parent's statement that he wanted to participate in the IEP meeting. The school district held the meeting on the scheduled day because the parent was not able to definitely commit to attend the meeting on either of two other possible days upon which school district personnel were available and that were also within the deadline for holding the IEP meeting. At the meeting, the school district changed the student's placement from a private facility to a local public school. Citing title 34 Code of Federal Regulations part 300.322(d), as well as Shapiro v. Paradise Valley Unified Sch. Dist. (9th Cir. 2003) 317 F.3d 1072, 1078, superseded on other grounds by 20 U.S.C. § 1414(d)(1)(B), the court determined that the school district had committed a procedural violation of the IDEA and deprived Student of a FAPE, because parent did not affirmatively refuse to attend the meeting, nor was the school district unable to convince parent to attend. (Doug C., supra, 720 F. 3d, at p.1045.) The court also criticized the school district for prioritizing the schedules of its personnel over the attendance of the parent. (Ibid.) The Doug C. court concluded that the student was deprived of a FAPE both because parent's opportunity to participate in the IEP formulation process was seriously infringed, and because the student was deprived of an educational opportunity because the merits of the private school he had been attending received insufficient consideration at the IEP meeting.

59. In the present case, District and Parent had agreed on the date and time for the IEP meeting. District waited 35 minutes for Father to arrive. During that time, District called Father to learn his whereabouts and whether he would attend the

meeting. Father did

35

not return the call, nor did he call the District to advise that he would be late to the meeting. Father arrived at the meeting 45 minutes late, while a teacher or service provider was reporting on Student's status or progress. There was some evidence that a welcoming gesture was made or attempted to be made to Father. Father began to speak as soon as he had the opportunity. He did not ask that the meeting start again from the beginning. He asked for "reports," but he had been sent reports previously. He asked whether the interpreter was a District interpreter, and was unhappy when he learned that she was. Father informed the other attendees at the meeting that Mother would not attend the meeting. After approximately four or five minutes, Father declared the meeting adjourned, and walked out.

61. Witness testimony varied as to whether Father was actually greeted and introduced to those assembled at the meeting. However, given Father's arrival during a presentation, the brief amount of time that he stayed at the meeting, and the fact that he had the floor during most of the time that he stayed at the meeting, any failure to introduce Father and formally welcome him during his few moments at the meeting would not be unreasonable. Moreover, there was no evidence that Father was asked to leave the meeting, and no evidence that anybody made any unwelcoming comments to Father. There was some evidence that Dr. Trivirio asked Father to stay. The evidence was uncontradicted that Father entered the meeting late, said what he wanted to say with respect to his objections to the District's conduct, unilaterally declared the meeting adjourned, and voluntarily walked out. The evidence was not persuasive that Father's objections at the meeting regarding the District's failure to honor his previous requests regarding reports and the presence of a District interpreter instead of an independent interpreter justified Father's abruptly exiting the meeting. Father had received at least some reports prior to the

meeting, and had received two reports during the meeting. Further, only Mother, not Father, required an interpreter to participate in the IEP meeting.

62. This case is distinguishable from the facts in Doug C., supra, for several reasons. First, in Doug C., the parent had expressed his desire to attend the subject IEP meeting. He worked with the district to obtain a convenient date to hold the meeting, and, when he was unable to attend the meeting on that date due to illness, he objected to the district holding the meeting without him, and attempted to work with the district to find a date on which the meeting could be rescheduled. The parent then attended a rescheduled IEP meeting, at which he objected to the IEP, and then filed a request for due process hearing. In this case, District had been attempting to obtain Parents' input regarding acceptable dates for the meeting, and Parents did not respond to these efforts for several months. Second, in Doug C., the parent had been unable to attend the meeting due to illness, and he requested that it be rescheduled. Here, Father was able to attend the meeting, and he did so, but he arrived late with no notice to the District, nor did he request that the IEP team members wait for him to arrive before starting the meeting. When he arrived at the meeting, he did not request that the meeting be restarted. Third, the IEP at issue in Doug C. changed the child's placement from a private school to a public school, and parent's absence from that IEP meeting strongly impacted his ability to participate in the development of the IEP and of his child's educational program. In the instant matter, the IEP team changed nothing about Student's placement or services, but offered nearly the same placement and services as was

36

in the IEP of November 7, 2014, to which Parents had previously consented. The only change was that the IEP did not offer compensatory speech and language services, as Student had completed all of the compensatory speech and language sessions the previous March. The team noted Parents' desire for a

**SpecialEdConnection® Case Report**

change in placement, and decided to discuss this issue at the next IEP meeting, with the anticipation that Parents would attend a future meeting.

63. Under all of these circumstances, District demonstrated that it was unable to

obtain Father's participation in the April 29, 2015 IEP team meeting, and that Father refused to attend the meeting. By continuing with the meeting without Father's presence, District did not substantially deprive Parents of the ability to participate in the development of Student's educational program, deprive Student of an educational opportunity, or deprive Student of a FAPE.

ORDER

All of the relief sought by Student is denied.

Copyright © 2016 LRP Publications